**PENTHOUSE INTERNATIONAL, LTD., Plaintiff,**

v.

**PLAYBOY ENTERPRISES, INC., and Playboy Publications, Inc., Defendants,**

**Robert C. Guccione, Add'l Defendant on Counterclaim.**

**No. 74 Civ. 2263.**

United States District Court, S. D. New York.

Sept. 11, 1974.

---

Finley, Kumble, Heine, Underberg & Grutman, New York City, for plaintiff, by Norman Roy Grutman, Alan M. Gelb, Jewel H. Bjork, James E. Merriman, New York City, of counsel.

Wachtell, Lipton, Rosen & Katz, New York City, Devoe, Shadur & Krupp, Chicago, Ill., for defendants, by Herbert M. Wachtell, New York City, David J. Krupp, Chicago, Ill., of counsel.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge.

Plaintiff Penthouse International, Ltd., the publisher of *Penthouse* magazine, has instituted suit against Playboy Enterprises, Inc. and Playboy Publications, Inc., the publisher of *Playboy* magazine. The gravamen of the plaintiff's complaint is the charge that the defendants have engaged in, and continue to engage in, the spreading of false and misleading information regarding *Penthouse's* circulation. The present application is a motion by the plaintiff for a preliminary order enjoining the defendants from continuing their allegedly libelous conduct.

As the two leaders in the magazine field euphemistically referred to as "sophisticated men's entertainment", *Playboy* and *Penthouse* have apparently watched the declines and falls of each other's circulation figures with great interest. Using circulation figures, particularly newsstand sales, *Penthouse* has recently run an advertising campaign which shows what it believes to be *Pent-*

*house's* great rise and *Playboy's* decline. While *Playboy's* initial corporate policy had been to ignore the nascent *Penthouse,* the growth of the newer magazine has apparently prompted *Playboy's* management to change its policy and to compete vigorously for circulation. The defendants' launching of a new and allegedly more sexually and erotically oriented magazine, *Oui,* was an attempt to reach those magazine purchasers who had been attracted to *Penthouse.*

Media publicity in general, and television and magazine interviews with the publisher of *Penthouse* in particular, have apparently brought the circulation clash between *Playboy* and *Penthouse* to the attention of the public and seems to have developed a somewhat charged atmosphere in which allegations of animosity between Hefner and Guccione, respectively the publishers of *Playboy* and *Penthouse,* have flourished. Mr. Guccione's statement during an October 1973 telecast of "Kup's Show", a Chicago based television program, that: "In newsstand sales in America *Penthouse* will have overtaken *Playboy* in December . . . ." focused attention on the December 1973 circulation figures.

When *Penthouse* certified to the Audit Bureau of Circulations (hereinafter "the ABC") its estimated circulation for the November and December 1973 issues, *Playboy* believed that the figures were inflated and eventually requested the ABC to perform an audit. When that audit was completed it revealed that *Penthouse* had overestimated the circulation of its November 1973 issues by 259,000 copies and had overestimated the circulation of the December 1973 issue by 613,000 copies.

After the revised circulation figures were published, the report was called to the attention of John G. Kabler, whose official title is the Midwest Advertising Manager of *Oui* magazine. In May 1974, the time when the revised figures were called to his attention, John G. Kabler had been with *Oui* for only a little over one year, and his prior experience in the magazine field consisted solely of one six month period of employment as a sales representative for *Sports Illustrated.* Further, while Mr. Kabler has the title of "manager", he is the *only* advertising space salesman employed by *Oui* to cover the Midwest.

When Mr. Kabler read the ABC revision of *Penthouse's* November and December estimated circulation figures, he confused two figures which are of great importance to magazine publishers: the minimum circulation guarantee and the estimated circulation. The former is the minimum circulation guaranteed by the publisher to its advertisers; it is the figure upon which rates for the sale of advertising space are based and, naturally, it is one object of advertisers to secure the greatest circulation at the lowest cost. The latter figure, the estimated circulation, is an estimate of net paid circulation that is certified by a publisher to the ABC, an organization composed primarily of publishers, advertisers and advertising agencies. Since magazines are sold on a fully returnable basis, and since returns are often late, it appears to be an industry practice to accept a minimal (generally 2%) difference between the estimated circulation and the circulation later verified by an ABC audit. In the case of *Penthouse's* December issue, this difference was 15%.

At the time Mr. Kabler received the revised circulation figures he was aware that within the last six months Penthouse had substantially raised its minimum circulation guarantee and he mistakenly concluded that the ABC revision meant that *Penthouse* had failed to meet its increased guarantee. In fact, the revised figures were still well above the new minimum circulation guarantee even though they were substantially lower than the net circulation figures which had originally been certified to the ABC.

Acting under his misunderstanding Mr. Kabler on May 14, 1974, the same day the revised figures were called to his attention, wrote a form letter directing attention to what he believed to be

the "fact" that *Penthouse* had failed to meet its minimum circulation guarantee.[1] On May 16, 1974, twelve copies of this form letter were sent to advertisers and advertising agencies; carbon copies of the twelve letters were also sent. Additionally, Mr. Kabler, on May 14, 1974, had also dictated a memorandum to seven *Oui* advertising salesmen in other offices and made one phone call to relay his interpretation of the revised figures.

Though the information contained in Mr. Kabler's letter was false, he had directed his secretary to attach to each letter and each memorandum that was sent out a copy of *Penthouse's* corrected ABC statement. Mr. Kabler mistakenly believed that the statement he enclosed supported his letter. In fact, by referring to the enclosed statement, the advertisers to whom the Kabler letter was sent could discover the error in the letter.

On May 21, 1974, Mr. Kabler called Mr. Dick Matullo of the Post-Keyes-Gardner advertising agency in Chicago, one of the people to whom the May 16, 1974 letter had been sent. Though Mr. Kabler was calling on an unrelated matter, Mr. Matullo advised him of the error in his letter. As soon as he understood the error Mr. Kabler apologized to Mr. Matullo and that afternoon sent a form letter of retraction[2] to all of the people to whom the original erroneous letter had been sent.[3] Kabler also made a retraction by telephone to the one person to whom he had phoned his misinformation.

*Penthouse* became aware of the Kabler letter and on May 24, 1974, three days after the letters of retraction were mailed, filed suit and immediately brought an order to show cause in this court seeking to enjoin *Playboy* from publishing or disseminating to past, present or potential advertisers or advertising agencies any untrue statement of fact in connection with the national circulation figures of *Penthouse* and, additionally, seeking to compel defendants to retract any such false statements that may have been made. The case was assigned to Judge Wyatt but due to his schedule and the plaintiff's demand for expediency the parties first appeared before Judge Cannella and later before Judge Ward. Expedited discovery was allowed and I heard the parties on oral argument on July 17, 1974. The parties agreed to submit depositions in lieu of a hearing on the preliminary injunction and I accepted the depositions in open court on July 25, 1974.

It is *Penthouse's* claim that the Kabler letter is merely part of a high level *Playboy* conspiracy to spread misinformation about *Penthouse* and to eliminate *Penthouse* as a competitor. *Penthouse* claims it is the only real rival *Playboy* has ever faced and that it alone prevents

---

1. The body of this letter was as follows:
   "Enclosed you will find a special Audit Bureau of Circulation Report concerning Penthouse. It concerns the average paid circulation for the 6 months ending December 31, 1973. It seems Penthouse *did not meet their guaranteed circulation in November 1973 by 256,000 copies.*

   "In December, The Penthouse circulation was 613,000 *under guarantee* for the 6 months ending December 31, 1973. They averaged 137,000 under what they guarantee. This obviously means that many advertisers were paying tremendous amounts of cash for circulation that was not even there.

   "I hope you find this data interesting and informative."

2. The body of the retraction letter was as follows:

"This is to amend my note dated May 16, 1974, concerning Penthouse circulation. The A B C Statement I sent is subject to an official audit. In my note I mentioned meeting a guarantee. I stand corrected, as this report merely stated that Penthouse was 869,000 under what they estimated for November and December 1973. The figures I mentioned were really underestimated amounts and not under their guarantee.

"I apologize for jumping to a rash conclusion."

3. Plaintiff makes much of the fact that one of the retraction letters was dated May 16, 1974, the same date that appears in the initial letters. I find no reason to disbelieve the testimony of both Mr. Kabler and his secretary Mary Lou Kovac, that the incorrect date was merely a typographical error.

monopolistic domination of the "sophisticated men's entertainment" field by *Playboy*.

*Playboy's* position has been that the Kabler letter was the unfortunate mistake of a rather low level employee of a subsidiary magazine who was acting alone and not in conspiracy with any person or persons at *Oui* or *Playboy*. *Playboy* also contends that the damages, if any, that have resulted from the Kabler letter can be compensated for by monetary damages and therefore an injunction is most unnecessary. In fact, *Playboy* argues that this entire suit is merely an attempt by *Penthouse* to divert attention from its own errors in certifying circulation to the ABC. Finally, *Playboy* asserts that it would ordinarily consent to a request for an injunction which restrains it from acts which it allegedly has neither committed nor intends to commit. However, in this case *Playboy* believes that consenting to the injunction would permit the plaintiff "to loose another broadside in the press",[4] and for that reason opposes the issuance of what defendants contend to be an unnecessary injunction.

■ To succeed on its motion for a preliminary injunction [5] the plaintiff must show either (1) probable success on the merits *and* possible irreparable injury *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardship tipping decidedly toward the party requesting the preliminary relief. Gresham v. Chambers, 501 F.2d 687, 691 (2d Cir. 1974), Sonesta Int'l Hotels Corp. v. Wellington Associates, 483 F.2d 247, 250 (2d Cir. 1973); Gulf & Western Indus., Inc. v. Great Atlantic & Pacific Tea Co., 476 F.2d 687 (2d Cir. 1973).

■ Plaintiff clearly has not satisfied any of these requirements for the granting of the extraordinary relief of a preliminary injury. Despite the claims of plaintiff's counsel, the voluminous materials submitted to the court reveal no showing of irreparable injury. Though injury to reputation or goodwill is *often* viewed as irreparable, such injury is not *always* irreparable. The authorities cited by the plaintiff do not lay down a per se rule as to the irreparability of injury to reputation but merely point out that such injury "often is viewed as irreparable," 11 C. Wright & A. Miller, Federal Practice and Procedure § 2948, at p. 439 (1973), or "may" be irreparable, Cutler-Hammer, Inc. v. Universal Relay Corp., 285 F.Supp. 636, 639 (S.D.N.Y.1968).

■ The record in this case not only fails to show irreparable injury to plaintiff's reputation or good will but, at the present time, the record is not even clear that any injury was suffered. Common sense seems to dictate that when Kabler sent advertisers a letter which was contradicted by the very enclosure sent to support it and which had to be retracted by an admission of error, it would be *Playboy*, Kabler's employer, rather than Penthouse which would suffer a greater damage to its reputation.

■ In summary, I find that Kabler's mistake was unintentional; that it was the action of an individual and not part of a conspiracy; that Kabler made a good faith effort to cure his error as soon as he was made aware of it; and that the damage, if any, resulting from Kabler's letter can be cured by monetary damages. Thus it would appear that plaintiff has failed to meet either test to succeed on its motion for a preliminary injunction. There is neither possible ir-

4. Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction, p. 11.

5. It is unnecessary to discuss the defendants' argument that this Court has no power to enter an injunction for a trade libel. Defendants rely on American Malting Co. v. Keitel, 209 F. 351 (2d Cir. 1913) and Fash-

ion Two Twenty, Inc. v. Steinberg, 339 F. Supp. 836 (E.D.N.Y.1971).

These cases in dicta seem merely to recite an anachronism growing out of the ancient division between law and equity. See R. Callmann, 2 The Law of Unfair Competition Trademarks and Monopolies, §§ 39–39.1(d), at pp. 216–233 (3d ed. 1968).

reparable injury nor a balance of hardship shown to tip decidedly in favor of the plaintiff. (I make no findings whatsoever on the merits of plaintiff's claim.) Accordingly, plaintiff's motion for a preliminary injunction is denied in all respects.

So ordered.