**PENTHOUSE INTERNATIONAL, LTD., Plaintiff,**

v.

**PLAYBOY ENTERPRISES, INC. and Playboy Publications, Inc., Defendants.**

No. 74 Civ. 2263.

United States District Court, S. D. New York.

March 31, 1980.

Grutman & Schafrann by Norman Roy Grutman, Jewel H. Bjork, New York City, for plaintiff Penthouse International, Ltd.

Devoe, Shadur & Krupp by David J. Krupp, Ronald Barliant, Chicago, Ill., Wachtell, Lipton, Rosen & Katz by Bernard Mindich, Ronald M. Neumann, New York City, for defendants Playboy Enterprises, Inc. and Playboy Publications, Inc.

## OPINION

GRIESA, District Judge.

This is a motion seeking dismissal of the complaint, or alternative sanctions, because of the failure of plaintiff Penthouse to comply with discovery obligations. The motion is granted, and the complaint is dismissed because of the willful misconduct on the part of Penthouse and its attorney.

The motion was precipitated by Penthouse's failure to comply with an order of the court of March 22, 1978. This order directed Penthouse to produce information in Penthouse's financial records pertaining to Penthouse's gross income, circulation income and net income. Penthouse refused to comply with this direction. However, this problem was only the latest incident in a series of problems about discovery, most of which antedated March 22, 1978. For instance, proceedings relating to Penthouse's answers to Playboy's interrogatories consumed two years, from September 1975 to September 1977, during which time Penthouse was twice assessed costs by magistrates for defaults. In connection with document discovery, one of the principal requests of Playboy related to estimates or forecasts of Penthouse's advertising revenues. Such documents were highly relevant to the case, since Penthouse was seeking substantial damages for alleged loss of advertising revenues claimed to have resulted from tortious activity by Playboy. Penthouse's misconduct and misrepresentations in connection with Playboy's request for these documents will be described in detail hereafter.

## I

The action was commenced on May 24, 1974. Plaintiff and defendants are the publishers of the sexually oriented magazines Penthouse and Playboy.

Penthouse claims that Playboy, out of concern for Penthouse's competitive threat, carried out a campaign to cause Penthouse to lose advertising, principally manifested in a letter written by one John G. Kabler in May 1974, which was allegedly designed to misinform Penthouse's advertisers and potential advertisers regarding Penthouse's circulation figures. Penthouse seeks injunctive relief and monetary damages.

Playboy has counterclaimed with charges of its own alleging unfair competitive practices by Penthouse.

The attorney in charge of the litigation for Penthouse is Norman Roy Grutman, Esq. In the early stages of the litigation, Mr. Grutman's firm was Finley, Kumble, Wagner, Heine, Underberg & Grutman. Later, Mr. Grutman became a member of Eaton, Van Winkle, Greenspoon & Grutman, and is now a member of Grutman & Schafrann. The attorney in charge of the case for Playboy is David J. Krupp, Esq. of the Chicago firm of Devoe, Shadur & Krupp. New York counsel for Playboy are Wachtell, Lipton, Rosen & Katz.

Certain persons connected with Penthouse who will be referred to in this opinion are:

| | |
|---|---|
| Bob Guccione | Publisher |
| Kathy Keeton | Associate Publisher |
| Gerald Kreditor | Accountant and advisor—informal "second in command" to Guccione |
| Irwin Billman | Chief Operating Officer |
| Marion Gorman | Vice President—Director of Advertising until some time in 1974 |
| Murray Roffis | Vice President—Director of Advertising succeeding Gorman |
| Marianne Howatson | Vice President—Director of Advertising as of time of trial |
| Woody Katsoff | Vice President—Advertising Administration |
| Robert Aronson | Assistant Controller June 1973–April 1974, and Controller thereafter until September 1975 |
| John J. Holland | Controller beginning November 1975 |

Shortly after the commencement of the action Penthouse moved for a preliminary injunction. The motion was assigned to Judge Duffy, sitting as the Part I judge. On September 11, 1974 Judge Duffy denied the motion. 392 F.Supp. 257.

On March 4, 1975 Playboy served a request for documents on Penthouse. Item 23 requested:

"Projections or estimates made by or on behalf of plaintiff of anticipated advertising space sales in Penthouse magazine for all issues beginning with the January, 1972, issue and including issues yet to be printed or distributed."

In depositions taken in June 1974 both Guccione and Katsoff had testified to the existence of advertising projections. However, Billman, in his deposition at the same time, denied that anyone at Penthouse made projections.

In April 1975 Penthouse produced a quantity of documents, which did not include any projections or estimates of advertising revenues. Playboy did not follow up the matter at this time.

On September 24, 1975 Playboy served a set of interrogatories on Penthouse. Under Fed.R.Civ.P. 33(a), Penthouse's answers or objections were due within 30 days, or by October 24, 1975. As of February 27, 1976, despite an explicit order by Magistrate Goettel, Penthouse had made no response. Playboy filed a motion for sanctions, which was returnable Monday, March 15, 1976. Penthouse finally served a set of answers on the previous Friday—March 12. On March 16 Magistrate Goettel made a report recommending imposition of $250 costs on Penthouse. Judge Wyatt approved this recommendation on March 18, 1976.

Interrogatories 2 and 3 requested identification of all parties claimed by Penthouse to have refrained from advertising in Penthouse as a result of the alleged tortious activity by Playboy. The response of Penthouse was that it did not intend to prove its claim of lost advertising revenues through identification of "specific accounts." Penthouse asserted that, based upon the "progress and momentum achieved by Pent-

house," there should have been a 20% increase in advertising pages during the year following the May 1974 Kabler letter, and a further 15% increase during the year thereafter. Penthouse made a calculation of its "lost" advertising revenues, based upon these estimates of expected growth, as compared with the revenues which it actually earned during the two-year period following the Kabler letter. The lost revenues, according to this calculation, were $6,670,550. See Answer to Interrogatory 5.

Playboy contended that these and other answers were inadequate. As a result of proceedings before Magistrate Bernikow, Penthouse served supplemental interrogatory answers on June 3, July 6, and July 31, 1976. Playboy was still not satisfied with the interrogatory answers. There were further proceedings before the magistrate. A hearing was scheduled for March 23, 1977. Penthouse failed to appear at this hearing. On March 23, 1977, Magistrate Bernikow made a report recommending imposition of $150 costs on Penthouse.

At this point the case was assigned to me. I held a conference on June 10, 1977, at which I accepted Magistrate Bernikow's recommendation about the $150 costs. There were still certain remaining disputes about the Playboy interrogatories, which I urged the parties to work out between themselves. This resulted in another set of supplemental interrogatory answers served by Penthouse on June 20, 1977.

On June 22, 1977 Penthouse took the deposition of Gerald Kreditor. Kreditor testified as to the existence of advertising projections or estimates, which he referred to as "budgets."

"Q Did there come a time when Penthouse did begin to prepare projections or estimates of potential advertising space sales?

"A Yes. We have over the last few years been preparing estimated budgets, internal budgets."

Kreditor testified that at the very early stages of Penthouse's business there were no written budgets, but the "actual written

budgets" dated back four years or so prior to the time of the deposition. He explained that the budgets he referred to were comprehensive budgets for the company. He further explained that, apart from these comprehensive budgets, there were advertising projections which were used to inform the people in the advertising department what was expected of them.

On July 8, 1977 Playboy served a request for production of documents. Items 2, 5 and 17 requested:

"2. All projections or estimates made by or on behalf of plaintiff with respect to advertising sales for the United States edition of *Penthouse* magazine in pages or dollars, for any period since 1969 to the date of the response to this request."

"5. All schedules, charts, lists or financial statements reflecting the sales of advertising space in either pages or dollars in the United States edition of *Penthouse* magazine for any month or period commencing after December 31, 1969."

"17. Financial Statements of plaintiff for all periods beginning after December 31, 1969, including but not limited to balance sheets, profit and loss statements and schedules of revenues from the sale of advertising space in *Penthouse* magazine."

On July 8 and July 12 I held pre-trial conferences, devoted to some extent to the remaining disputes about Playboy's interrogatories. I found that there were certain items which required further answers on the part of Penthouse. However, I became persuaded at that time (largely by strenuous arguments of the Penthouse attorney Grutman) that Playboy was being overly litigious in regard to its interrogatories. I indicated an intention to put an end to discovery disputes and bring the case to trial. I requested that there be no written motions on discovery matters, and that any remaining discovery problems should be handled at pre-trial conferences.

On August 8, 1977 Penthouse served its response to the recent Playboy request for documents. Every request was objected to. The objections to Requests 2, 5, and 17 were:

*Request 2*

"1. Request No. 2 calls for the disclosure of highly sensitive, confidential, commercial information and trade secrets.

"2. To the extent such existing documents have been prepared in connection with this lawsuit, Request No. 2 calls for the disclosure of documents which fall within the attorneys work-product privilege."

*Request 5*

"1. Request No. 5 calls for the disclosure of highly sensitive, confidential, commercial information and trade secrets.

"2. To the extent such existing documents have been prepared in connection with this lawsuit, Request No. 5 calls for the disclosure of documents which fall within the attorneys work-product privilege."

*Request 17*

"1. Request No. 17 calls for the disclosure of highly sensitive, confidential, commercial information."

On September 1, 1977 Penthouse served its final supplemental answers to the Playboy interrogatories.

Further pre-trial conferences were held on September 14 and 15, 1977. Playboy requested the opportunity to take six more depositions. Grutman argued that Playboy was prolonging and abusing the discovery process. I denied Playboy's request for the additional depositions.

At a pre-trial conference of November 17, 1977, there was some discussion about Penthouse's refusals to produce documents. The attorney for Playboy brought up the subject of budgets or projections for advertising. In response, Grutman represented that no such documents existed. There was also a discussion of Penthouse's failure to turn over "call reports"—*i. e.*, records of alleged efforts by the Penthouse advertis-

ing staff to counteract the Kabler letter. These documents were relevant to a damage claim of Penthouse based upon the theory that the Kabler letter resulted in expenditure of time and money by Penthouse to counteract it. Grutman stated that his client would not turn over the documents, claiming them to be privileged. I ruled that, if the call reports were not produced this damage claim would not be entertained.

The trial commenced January 31, 1978 to the court without a jury. On the second day of trial, Grutman questioned Kathy Keeton about what increase in advertising revenues was projected at the end of 1973 for 1974. Keeton testified that Penthouse made projections at the beginning of each year, and would have expected a 20% increase in 1974 over 1973. This line of inquiry, of course, related directly to the claim of lost advertising revenues of $6.5 million. Krupp, the Playboy attorney, objected to the testimony on the ground that Penthouse had not produced any documents about this projection of 20% increase. This occasioned the first of several discussions at the trial on the question of whether Penthouse had any documents about advertising projections which should be produced at the trial and which should have been produced prior to trial. Grutman made the following statements to the court (Tr. 255):

"THE COURT: Was an effort made to find any written projections?

"MR. GRUTMAN: Yes, Your Honor.

"THE COURT: What was the result of that?

"MR. GRUTMAN: We do not have any written projections. We have the testimony of this witness and the performance of the company."

Kathy Keeton testified that there were no written advertising projections that she was aware of (Tr. 256).

Shortly thereafter Krupp raised the point again and questioned Grutman's representation as to the non-existence of advertising projections. Krupp pointed out that Guccione, in his 1974 deposition, had testified to the preparation of advertising projections

and had further testified that he had, at that time, just been shown a $10 million forecast by Kathy Keeton. Krupp also noted that, in Penthouse's August 8, 1977 response to Playboy's document request, Penthouse had not denied the existence of advertising projections, but had objected to their production on grounds of confidentiality and privilege. However, Grutman persisted in his position, stating (Tr. 310):

"I represent that it was not part of the business of Penthouse and it did not keep or maintain forecasts or written projections."

And further (Tr. 312):

"There are no projections, there are not estimates in writing.

"THE COURT: You are using the present tense. Do you mean that projections once existed but they have been destroyed?

"MR. GRUTMAN: No, your Honor. They never prepared written projections or written estimates."

Guccione was then called as a witness. In the course of both his direct questioning by Grutman and his cross-examination by Krupp, Guccione stated that Penthouse does not create advertising forecasts (Tr. 350), and that to his knowledge no such paper ever existed (354), and further that he never received any projection or estimate of advertising sales for 1974 (425). When confronted with his deposition testimony about receiving a $10 million forecast, he denied that the $10 million figure ever appeared on a piece of paper (427–28), and denied that he had ever received a projection for any year's advertising (436). He stated that it would have been madness and impossible to project advertising revenues at Penthouse for a year (433). Guccione stated that there were "pagination sheets" prepared for individual issues, but that they were ephemeral—scrap paper—and not kept once an issue was closed (432–33, 440).

Gerald Kreditor was later called as a witness by Penthouse. In answer to a question by Grutman as to whether there were any written forecasts or written projections of advertising on an annual, semiannual or

quarterly basis, Kreditor testified (971), "There were never any written projections." Kreditor indicated that he discussed projected figures with Guccione, and that there was "possibly a note of a figure that was a target figure," but that any such notes were not kept (971–72). Kreditor testified, in support of Penthouse's damage theory that he, Guccione and Keeton had discussed a projected 30% increase in advertising pages for 1974 over 1973 (1015).

On cross-examination, Kreditor testified that he discussed with Guccione estimates of income, expenditure and net profit, but these were very seldom reduced to writing because "they are very rough and sort of private pieces of paper" (1280–81). Kreditor reaffirmed that there were no written budgets containing statements of potential advertising space sales (1282).

Krupp then read from Kreditor's June 1977 deposition, in which Kreditor had testified that written budgets, or projections of advertising sales, had commenced being prepared about four years before the time of the deposition (1283). Kreditor responded (1290–91):

> "I said to Mr. Krupp when he took my deposition that I felt sure that I would have pieces of paper that were the basis of these budgets that I used to discuss with Mr. Guccione and the individual departments."

Kreditor stated that following his deposition he had a search made of his office in London and had not come up with any budgets except cost budgets for the last two or three years (1290–91).

During the course of the discussion surrounding the Kreditor testimony, Grutman again represented flatly that projections or budgets of advertising revenues did not exist, and that Penthouse had never had such documents and did not have them at the time of the trial (1285 and 1316).

John J. Holland, Controller of Penthouse beginning in 1975, testified. He stated that he had never seen a document from the Advertising Department projecting advertising income (1348). In connection with the Holland testimony, Penthouse introduced a group of documents consisting of daily reports of advertising sales. Holland testified that these reports were not projections, but were records of advertising sales actually made, even though such actual sales related substantially to issues of the magazine subsequent to the date of the report (1333–39; Pl. Ex. 77).

The trial recessed on February 13, 1978. On the day of adjournment there was an extensive discussion about the document production problem. Grutman repeated that there were no written forecasts or budgets or prophecies of advertising revenues (1472–73). However, the court directed Grutman to make a further check on whether advertising projections existed. Also, Krupp on behalf of Playboy listed certain other items, such as the records of advertising sales and information in the Penthouse financial statements, which had never been produced and which he requested to be produced.

At a hearing held March 3, 1978, Grutman stated that, since the time the trial had adjourned, a further search for documents had been made. The advertising projections, whose existence had been repeatedly denied at the trial, had been found and would be produced. Other documents which had been requested by Playboy before the trial were also ready for production. However, at the hearing of March 3 and another hearing of March 22, Penthouse invented a new obstacle. Penthouse objected to producing material in the monthly financial statements relating to gross revenues, circulation revenues, and net income. This objection was based on alleged competitive sensitivity. I overruled the objection on March 3, except that I limited the use of the materials on these three items to Playboy's attorneys, for the time being. On March 22 Penthouse raised the matter again, and I adhered to my ruling of March 3. Grutman's response to this was to ask what sanctions would be imposed if Penthouse refused to turn the materials over. I declined to discuss this subject and reiterated the direction.

Following the March 22 meeting, Penthouse notified Playboy that Penthouse would indeed refuse to produce the materials in the monthly financial statements pertaining to gross revenues, circulation revenues and net income. This led to the filing of the present motion for sanctions on May 9, 1978.

At a hearing of May 12, 1978, Krupp requested, among other things, removal of the confidentiality restriction, referred to above, with respect to certain of the Penthouse documents. After discussion, it appeared clear that Penthouse's claims of competitive sensitivity were baseless, and Krupp's application was granted.

## II

The following is a description of the principal categories of documents which were produced by Penthouse in March 1978 after the trial had recessed.

There were eight advertising projections emanating from the Advertising Department of Penthouse, most of which were specifically labelled as such. Most followed a standard format, with estimates for a 12-month period, usually February through January (Penthouse's fiscal year), for advertising pages and dollar revenues month by month, totalled for the year. In most of these documents the projected figures were compared with actual figures for the previous 12 months.

The following is a list of these projections, with the dollar amounts projected for the year in question. Except in two cases, the period is February through January of 1973–74 or 1974–75. The two exceptions are the projections of February 8, 1973 and April 2, 1973 which relate to January-December 1973.

| Date | Period | Amount |
| --- | --- | --- |
| 2/8/78 | 1973 | $ 4,301,001 |
| 4/2/73 | 1973 | 5,122,876 |
| Undated | 1973–74 | 5,485,906 |
| 7/13/73 | 1974–75 | 9,652,000 |
| 11/1/73 | 1974–75 | 14,772,665 |
| Undated | 1974–75 | 9,654,508 |
| 12/7/73 | 1974–75 | 10,390,383 |
| 4/29/74 | 1974–75 | 9,002,280 |

In addition to these projections emanating from the Advertising Department, there were various documents from the Controller's Department of Penthouse containing overall Penthouse budget figures, which included projections of advertising revenues. There is a document entitled "Penthouse Int. Ltd. Budget Summary," with a notation "Not To Be Used," which contains figures for January through December 1974 and totals for the 12 months. This budget is undated, but was apparently prepared in late spring 1974. The projected total for advertising revenues is $9,183,762. There is a revised budget of June 6, 1974 of the same title and format, covering the period of January through December 1974. The revised projected total for advertising revenues is $7,378,276.

There is no occasion in this opinion to deal with the merits of the case, or to make any final determination as to whether these documents support the position of one side or the other. However, there is ample indication that the documents are of value to the defense of Playboy, and that Playboy was substantially prejudiced in not having access to these documents during the pretrial discovery proceedings and at the trial. As noted earlier, documents regarding advertising projections were demanded as early as March 4, 1975. These documents tend to show that there were some rather generous projections generated by the Advertising Department of Penthouse for the fiscal year 1974–75, and that, commencing well before the Kabler letter of May 1974, these projections were being scaled down. The final projection issued by the Controller on June 6, 1974 (pertaining to the period January through December 1974) was $7.378 million. The actual advertising revenue for the fiscal year February 1974 through January 1975 was $7.742 million.

Thus the advertising revenue projection of June 6, 1974 was roughly of the same magnitude as what the actual revenue turned out to be for the year. There is no indication that the lowered estimate of June 6 was based on any concept of lost revenues due to the Kabler letter. If indeed, for factors entirely independent of

the Kabler letter, the advertising revenue projections had already been reduced, this could mean that there were no "lost" advertising revenues resulting from that letter. In this connection, it is interesting to note that one of the documents not revealed until March 1978 is a memorandum of the Advertising Department dated January 3, 1974 calling a meeting of the New York sales staff

"to discuss the depressed projections for May and June advertising in Penthouse."

Aside from the documents listed above, there was a substantial quantity of other documents which referred to advertising projections and made use of them. There was a cash flow projection given to the Chemical Bank in the spring of 1974 in connection with a loan, which was based in part on projections of advertising revenues. There were monthly financial statements, which contained both budget and actual figure for the month and for the year up to and including that month. These documents were not produced until March 1978, and in the case of the financial statements, Penthouse refused to comply with the court's directions even then.

There was another category of documents, which Penthouse claims does not refer to advertising projections, but refers to advertising actually sold. These documents were entitled "Sales Reports," and were issued daily by the Advertising Department. Existence of these documents was disclosed at the trial. However, they had not been produced prior to the trial. Clearly they should have been produced pursuant to the request of July 8, 1977, which asked for all documents relating to advertising projections, and also for all documents relating to advertising sales. The same would apply to another category of documents, which contained records of advertising space sales for individual accounts. These documents also were not produced until March 1978.

There are various other documents of Penthouse which were not produced until March 1978, and which were called for by Playboy's pre-trial requests. I will not attempt to set forth a complete description in this opinion.

### III

Playboy's motion for sanctions has resulted in the development of a voluminous record. Factual submissions have been made by way of both affidavits and testimony.

Penthouse's positions on the motion have been mainly (1) an attempt to obtain reconsideration of the court's directions of March and May 1978 to produce financial statement information regarding gross revenues, circulation revenues, and net income; and (2) an attempt to explain why Penthouse did not turn over advertising projections prior to March 1978.

On the first point, it should be noted that the matter was not only argued once on March 3, but was reargued on March 22. It was further discussed on May 12, 1978 in connection with Playboy's request for withdrawal of the limited confidentiality order. There was no question but that this court made a final ruling on March 22 regarding the basic question of production of the materials and made a final ruling on May 12 that the limited confidentiality restriction was withdrawn. Nevertheless, contrary to elementary principles of proper procedure, Penthouse not only refused to produce the materials, but persisted in attempting to further reargue the matter again and again in its papers submitted in opposition to the Playboy motion for sanctions. Although Penthouse did not submit a brief on the issue in March or May 1978, a brief was filed shortly before a hearing of July 31, 1978, in an attempt to obtain reargument at that time. I declined to accept the brief or hear reargument.

With regard to Penthouse's explanation of its failure to produce the documents relating to advertising projections until March 1978, some elaboration is necessary.

Penthouse has argued at some length that the projections and budgets produced in March 1978 were not "official" or "approved," but were only the "private obsession" of a former Advertising Vice Presi-

dent, Marion Gorman. This is apparently intended to suggest that there was a valid excuse for not producing these documents earlier. This presentation is misleading and avoids the issue. Playboy's document requests were not limited to items which had the status of "official" or "approved." Moreover, there is every reason to believe that the Penthouse projections were normal business documents, rather than the private papers of some individual. In any event, they were clearly called for by the Playboy requests.

The evidence on the sanction motion shows that the documents containing advertising projections were present and readily available at the Penthouse offices in March 1975 when the first Playboy document request was served. They were, of course, also still in existence at the time of the second Playboy document request in July 1977, although by this time they may have been moved to a warehouse.

There is a total failure to explain satisfactorily why these documents were not produced.

Grutman testified at a hearing held August 29, 1978. He stated that he was in charge of the litigation for Penthouse in March 1975. However, his partner, Allan Gelb, handled the response to the Playboy document request. Grutman has no recollection of reading the Playboy request. He has no knowledge of what Gelb did to respond to the request. He obtained no report from Gelb on the subject.

Penthouse has produced neither affidavit nor testimony from Gelb as to what was or was not done in connection with the March 1975 Playboy document request. No evidence on this subject has been elicited from anyone at Penthouse, except from the then Controller, Robert Aronson, who was called as a witness by Playboy. Aronson testified that the budgets, and the monthly financial statements comparing actual figures with budget (both of which types of documents contained advertising projections) were in his office in March 1975. At no time did any attorney or anyone at Penthouse request him to provide budgets, projections, financial statements or any other documents for the purposes of this litigation.

Of course, the most obvious source of documents containing advertising projections was the Advertising Department. It is significant that there is no evidence about what, if anything, transpired with the Advertising Department in connection with the Playboy March 1975 document request.

It strains credulity to believe that the failure to produce the advertising projections in response to Playboy's March 1975 request was the result of an innocent mistake.

The executives of Penthouse were fully familiar with the advertising projections, and with the budgets and financial statements referring to the advertising projections. Guccione and Katsoff testified about advertising projections in their June 1974 depositions, and Kreditor did the same in his June 1977 deposition. Billman, who has admitted to being an important liaison between Penthouse and its attorneys in respect to the present litigation, was familiar with the advertising projections.[1] The then Vice President—Director of Advertising, Roffis, was familiar with them.

Grutman had been present at the 1974 depositions and had heard Guccione and Katsoff testify about advertising projections. I find it difficult to believe that Grutman did not read Playboy's March 1975 document request, and that he took no part in handling the response to that request, but turned the matter entirely over to Gelb. If indeed he dealt with the matter in this fashion, it was a serious abdication of his responsibilities.

In view of all the circumstances, I conclude that there was a conscious decision by one or more persons in the management of

1. In a June 1974 deposition Billman denied that anyone in Penthouse made projections. In a May 1978 deposition, when he was shown advertising projections addressed to him, he denied memory of these. I find that this testimony of Billman at these two depositions was false.

Penthouse to conceal, and fail to produce, the advertising projection materials in response to the March 1975 document request of Playboy. Exactly who participated in this decision I do not know. I am not prepared to say whether Grutman participated in this decision, although, as stated earlier, it is difficult to credit his testimony that he was totally divorced from this important phase of the litigation.

As described earlier, the next step in the story about the advertising projections was Playboy's renewed request for these documents in July 1977. In attempting to explain the failure to produce the advertising projection materials in response to this new request, Grutman testified that he considered the request untimely, as occurring after the court had cut off discovery, and he decided that the request would not be complied with. He told this by way of instruction to his associate, Richard A. Rubin.

This "explanation" is of no weight. The court had not cut off discovery as of July 1977. In any event, Grutman made no objection to the document requests on the grounds of lateness. The Penthouse objections, which were filed in August 1977, were based upon claims of commercial confidentiality.

Grutman had been present at the deposition of Kreditor in June 1977, when Kreditor testified to the existence of advertising projections. It is perfectly obvious that, in response to Playboy's June 1977 document request, Grutman and the management of Penthouse decided to defy their discovery obligations and hold back the various documents·requested, including the advertising projections.

The next step—and an astonishing one, in view of the fact that Penthouse had just asserted the confidentiality of advertising projections—was for Grutman and the management of Penthouse to deny the existence of such projections. As stated earlier, Grutman took this position at a pre-trial conference in November 1977 and repeatedly at the trial. Sworn testimony to this effect was given by Guccione, Kreditor and Keeton at the trial. Of course, the repre-

sentations and testimony in this regard were incorrect.

In connection with the sanction motion, Grutman attempted to show that his representations about the nonexistence of the projections were made in good faith on the basis of information he had obtained from Penthouse personnel.

Grutman called Penthouse Controller Holland to testify about an alleged inquiry to Holland by Grutman regarding the existence of budgets. At first Holland stated he could not recall any such inquiry. Then he changed his testimony and stated that he recalled a conversation with Grutman in which he advised Grutman that there were no corporate budgets. Grutman also called as a witness Marianne Howatson, the current Vice President—Director of Advertising at Penthouse. Howatson testified that at some point Grutman asked her if the Penthouse Advertising Department had any written advertising projections, to which Howatson responded in the negative.

These alleged inquiries were made during the trial in early 1978. As of this time, it appears that the Controller's Department and the Advertising Department of Penthouse were not making budgets or projections. However, no one was interested in *1978* budgets or projections. If any meaningful inquiry was to be made, it would have been as to whether Penthouse had any advertising projections dating back to 1973, 1974 and 1975. A search should have been requested for such documents. However, it is clear from the testimony of both Holland and Howatson that no such specific requests were made for 1973, 1974 and 1975 documents, and that there was no request for a search.

With regard to the representations of Grutman, and the testimony of Guccione, Kreditor and Keeton, about the non-existence of advertising projections, I make the following findings. I find that Guccione, Kreditor and Keeton knowingly gave false testimony. Each of these persons was fully aware of the existence of the advertising projections. As for Guccione and Kreditor, they were shown their prior deposition testimony in which they had specifically ac-

knowledged the existence of the projections. In spite of this, Guccione and Kreditor persisted in taking the position at the trial that such projections never existed. This was a blatant defiance of their oath to tell the truth.

With regard to Grutman, at the very least he was making representations to the court which he knew he had no basis to make. However, the strong probability is that Grutman knew at least in a general way of the existence of the advertising projections and nevertheless stated that there were no such projections. In either case there were willful misrepresentations to the court.

I should here note an additional instance of false statements by Grutman and Kreditor.

In his testimony on Playboy's sanction motion, Grutman testified that, prior to his alleged inquiry of Holland at the time of the trial of this action,

"*I had never seen a financial statement of Penthouse* and it was the company's policy not to permit anybody to see it other than Mr. Guccione, Mr. Anthony Guccione, Irwin Billman and the company's auditor, . . ." (Minutes of August 29, 1978, p. 350) (emphasis added).

Later in his testimony, Grutman stated:

"THE WITNESS: To the extent that I didn't make it clear to your Honor, I would like to close my direct testimony by stating that I had not seen the contents of any documents or financial records about which the privilege of confidentiality was asserted as early as June of 1974 and consistently maintained, and *I never saw a financial statement of Penthouse until we were actually on trial.*" (p. 372) (emphasis added).

In his affidavit of September 15, 1978, Kreditor stated (par. 7):

"Up until the time documentary production of financial statements was required, no one from Mr. Grutman's office, including Mr. Grutman, had ever seen a Penthouse financial statement."

It is clear that the time of "documentary production of financial statements" referred to by Kreditor was March 1978.

The testimony of Grutman and the affidavit of Kreditor were untrue. Playboy has produced on the present motion portions of the record of *Gould ·Paper Co. v. Curtis Circulation Co.* (76 Civ. 1154) (S.D.N.Y.), in which Grutman represented Curtis. At the trial of the *Gould* action in January 1977, Grutman questioned Kreditor about financial statements of Penthouse for the years 1969 through 1973, and offered these documents into evidence (Exhibit A to Defendants' Proposed Findings on sanction motion).

Thus, Grutman had seen a series of financial statements of Penthouse in January 1977, and Kreditor knew that he had done so. In order to excuse Grutman's late production of Penthouse financial statements in the present case, Grutman and Kreditor chose to state falsely that Grutman had not seen any financial statements of Penthouse until early 1978.

## IV

Playboy has made a convincing presentation that various other documents, damaging to Penthouse's case, were withheld until March 1978. These included internal memos of Penthouse regarding the attitudes of advertisers in the spring of 1974, and a series of documents which appear to be at complete variance with the testimony of Penthouse witness Eisenberg that he was terminated as Penthouse's advertising representative on the west coast in 1974 because of his failure to achieve an increase in sales. Among the latter documents are what appear to be an agreement of January 1, 1975 between Penthouse and Eisenberg's company and records of sales by Eisenberg of advertising for Penthouse in 1975 and 1976.

## V

I conclude that Penthouse and its attorney flagrantly and willfully violated the rules of the discovery process over almost the entire course of this litigation. This was accompanied by subterfuge, misrepresentation and false testimony. Penthouse made a total mockery of the discovery process and this case.

The appropriate sanction is dismissal of Penthouse's complaint. Fed.R.Civ.P. 37(b)(2)(C); *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 642–43, 96 S.Ct. 2778, 2780–81, 49 L.Ed.2d 747; *Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062 (2d Cir. 1979). If the complaint were not dismissed, discovery proceedings would need to be virtually re-commenced. Most of the witnesses who testified at the trial prior to the recess would need to be re-examined. Such a result would be intolerable.

### Conclusion

For the foregoing reasons, the motion of defendants to dismiss the complaint is granted.

So ordered.

