663 F.2d 371
 PENTHOUSE INTERNATIONAL, LTD., Plaintiff-Appellant, Cross-Appellee,
and
Norman Roy Grutman, Intervenor-Appellant,
v.
PLAYBOY ENTERPRISES, INC. and Playboy Publications, Inc.,
Defendants-Appellees, Cross-Appellants.
 Nos. 449-451, Dockets 80-7515, 80-7517 and 80-7535.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 17, 1980.
Decided Oct. 28, 1981.
 
 Samuel N. Greenspoon, New York City (John Van Voorhees, Eaton, Van Winkle & Greenspoon, New York City, of counsel), for plaintiff-appellant.
 David J. Krupp, Chicago, Ill. (Stephen J. Bisgeier, Ronald Barliant, Krupp & Miller, Chicago, Ill., Bernard Mindich, Marc H. Rosenbaum, Wachtell, Lipton, Rosen & Katz, New York City, of counsel), for defendants-appellees.
 Harold R. Tyler, Jr., New York City (Michael B. Mukasey, Patterson, Belknap, Webb & Tyler, New York City, of counsel), for intervenor-appellant.
 Before MOORE, MANSFIELD and NEWMAN, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 Plaintiff, Penthouse International, Ltd. ("Penthouse"), appeals from a judgment of the Southern District of New York entered by Judge Thomas P. Griesa dismissing its diversity trade libel suit against Playboy Enterprises and Playboy Publications, Inc. (collectively referred to as "Playboy") because of Penthouse's refusal to produce certain of its financial records pursuant to the court's order made on March 22, 1978. Norman Roy Grutman, counsel for Penthouse in the district court proceedings, appeals an order entered by Judge Griesa denying his motion pursuant to Rule 24, F.R.Civ.P., to intervene as a party, made after the district court's decision to dismiss the action, which was sought on the ground that Judge Griesa's opinion condemning his conduct as trial counsel adversely affected his professional reputation, giving rise to an interest conflicting with that of his client Penthouse. Playboy cross-appeals from the district court's failure to award it reasonable costs and expenses upon its motion for dismissal and from its order granting summary judgment dismissing four of five counterclaims asserted by it. Intervention by Grutman as a party on this appeal is granted. However, we affirm the judgment dismissing Penthouse's action and the four counterclaims, and remand to the district court for further consideration the question of whether reasonable costs and expenses should be awarded to Playboy.
 
 
 2
 In view of the serious misconduct found by Judge Griesa to have been committed by Penthouse, which included findings of deliberate false testimony on the part of its officials and willful misrepresentation to the court of material facts by Grutman, and the harsh sanction imposed for non-production of relevant documents, a thorough review of the record is essential to determine whether there was any error or abuse of discretion on the part of the district court. Penthouse publishes sex-oriented magazines which compete against similar magazines published by Playboy. The present litigation originated in May, 1974, following a letter by a Playboy official which allegedly libeled Penthouse. In early 1974 Penthouse was required by the Audit Bureau of Circulations, a membership corporation of publishers and advertisers which audits the circulation claims of its members, to issue a revised publisher's statement for the last six months of 1973 and to reduce substantially its claimed advertising sales for November and December. John G. Kabler, defendant's advertising salesman for its competing magazine Oui misinterpreted this action to mean that Penthouse had failed to meet its guaranteed minimum circulation figure by the amount of the reduced copies and on May 16, 1974, sent a letter to various advertising executives to that effect. In fact Penthouse had, notwithstanding the reduction, met its minimum guarantee and when Kabler learned this he on May 21, 1974, sent out a letter correcting the inaccuracy, which Judge Kevin Duffy, in a later ruling on Penthouse's application for a preliminary injunction, found to be unintentional. 392 F.Supp. 257.
 
 
 3
 On May 24, 1974, three days after Kabler's retraction, Penthouse brought the present suit against Playboy for $10 million compensatory damages, $30 million punitive damages, and injunctive relief. The complaint alleged that Playboy knowingly distributed false information about Penthouse's circulation with the purpose and intent of interfering with its existing beneficial relationships with advertisers, destroying Penthouse's reputation and goodwill, and inducing existing and potential advertisers not to patronize it; that the Kabler letter amounted to a malicious trade libel compelling Penthouse to expend substantial sums to rebut the false statements, including purchase of self-advertising space for correction of the false statements; and that the libel was committed pursuant to a conspiracy on the part of the defendants. Defendant's answers amounted to a general denial except for their admission that the Kabler letter was sent. In addition they interposed five counterclaims. Two (the First and Third) claimed that Penthouse had violated Playboy's rights under the Lanham Trade-Mark Act, 15 U.S.C. §§ 1051, et seq., by using Playboy's registered marks in competitive advertising that created a likelihood of confusion by giving greater prominence to Playboy's marks than to Penthouse's marks, by parodying Playboy's marks for the purpose of trading on and injuring its goodwill, and by using the marks in connection with misleading statistics that falsely implied that Penthouse's circulation was greater than it actually was. The Second and Fourth counterclaims alleged that the same conduct constituted unfair competition. The Fifth counterclaim charged that Penthouse engaged in a false advertising and promotional campaign, misrepresenting circulation figures with respect to the magazines Penthouse and Playboy, in order to injure Playboy. Damages and injunctive relief were sought.
 
 
 4
 Penthouse's complaint was not limited to the theory that it was damaged per se by a slur on its reputation, which would be questionable, see Harwood Pharm. Co. v. National Broad. Co., 9 N.Y.2d 460, 463, 214 N.Y.S.2d 725, 727, 174 N.E.2d 602 (1961); Payrolls & Tabulating Inc. v. Sperry Rand Corp., 22 A.D.2d 595, 257 N.Y.S.2d 884 (1st Dep't 1965). It sought special damages for interference with and injury to its anticipated business with existing and potential advertisers and with its publication of magazines, and recovery of expenses which had and would be incurred by it to notify the advertising community that its sales had not declined below minimum guarantees, including money expended for the purchase of corrective advertising space and preparation of self-promotional advertisements. This claim of specific pecuniary loss, including loss of customers, see Drug Research Corp. v. Curtis Publ. Co., 7 N.Y.2d 435, 440, 199 N.Y.S.2d 33, 37, 166 N.E.2d 319 (1960); Continental Air Ticketing Agency, Inc. v. Empire Int. Travel, Inc., 51 A.D.2d 104, 380 N.Y.S.2d 369 (4th Dep't 1976), would, if pursued (as it later was at trial), require it to introduce evidence of actual loss of business. This, of course, entitled Playboy to discovery of Penthouse records bearing on any such alleged loss. The scope of discovery permitted Playboy under the Federal Rules of Civil Procedure was broad. It was entitled to any Penthouse records relating to the "subject matter" of the action which might lead to admissible evidence. Rule 26(b), F.R.Civ.P.
 
 
 5
 Playboy asserted that any decline in Penthouse's advertising revenues was attributable to causes unconnected with the Kabler letter, including (1) an increase in Penthouse's page rates which it had put into effect in September, 1973, six months before the letter, (2) the levelling off of Penthouse's circulation which had begun with its saturation of the market, (3) an ongoing economic recession affecting print media, (4) readers' distaste for the magazine Penthouse's editorial content, and (5) the effect of the revelation that Penthouse had in fact substantially overestimated the size of the circulation of its November and December issues.
 
 
 6
 From the outset the relevancy to the issues in the case of Penthouse projections made before the Kabler letter of anticipated advertising revenues and of any budget estimates of such anticipated revenues was patent. As Penthouse later acknowledged in its appeal brief to us, it contended that it would "establish a reasonable anticipated growth in advertising sales which was frustrated and hampered by the libel" (Penthouse Br. p.7). If pre-Kabler letter projections and budgets existed, they would indicate what advertising revenue Penthouse expected to gain from its operations. If advertising revenues actually received after the letter proved to be greater than or equal to these projections or budget estimates, this evidence would support Playboy's defenses that the Kabler letter caused Penthouse no injury; if smaller, this would support Penthouse's claim. For the same reason, advertising revenues actually received after the Kabler letter were relevant for comparison against pre-Kabler letter anticipated revenues.
 
 
 7
 As pre-trial discovery developed, Penthouse asserted in answer to interrogatories that it would prove that the Kabler letter forced it to expend large sums for corrective advertising and self-promotion-some $748,144 for expenses of advertising to counter the alleged libel and $625,000 for expenditures of time of Penthouse officials to rebut the libel (App. 349). Penthouse's financial statements for the post-Kabler letter years, including gross income, net income, and circulation revenues, were therefore relevant. The amount spent by Penthouse on self-promotional advertising might increase or decrease according to actual changes in its gross revenues and net profits. If Penthouse earned more money in 1974 and 1975 than in 1973 it could afford to spend more money proportionately on self-advertising and promotion, regardless of the alleged Kabler libel.
 
 
 8
 Thus an increase in Penthouse's advertising expenses might actually be attributable to increased revenues from its operations rather than to the letter. At least Playboy was entitled under Rule 26(b) to obtain this data and develop this defense even if Penthouse might disagree with the probative value of the evidence. Some businesses operate on the principle that the amount of money expended on self-advertising depends on the amount of their gross sales and income.[1] Moreover, if, as appears to have been the fact, Penthouse's circulation in 1973, while not below its guarantee, was nevertheless substantially below its public claims and estimates (by 256,000 copies in November 1973 and 613,000 copies in December 1973), Playboy was entitled to show that Penthouse spent more money on promotion and self-advertising thereafter in order to improve its circulation (and thus permit it to increase its rate base to advertisers in Penthouse) rather than to rebut the Kabler letter. Playboy properly sought to establish such correlations by obtaining Penthouse's gross revenues, net revenues, and circulation income.
 
 
 9
 Immediately following the May 24, 1974, commencement of the action, pre-trial discovery was begun by Playboy. On June 17, 1974, the Penthouse Vice-President responsible for administration and record maintenance in its advertising department, Sherwood Z. Katsoff, testified at a deposition attended by Grutman that Penthouse had made projections of its anticipated advertising revenues, with which he was familiar. His testimony clearly indicates to the reader or listener that these projections were written. He stated that several projections had been made, including one by Katherine Keeton, Associate Publisher of Penthouse. (App. 461-63).[2] This was confirmed by his testimony at a later 1978 hearing before Judge Griesa on Playboy's motion for sanctions sought because of Penthouse's defiance of a court order to produce certain documents and by the projections themselves, which were eventually produced in 1978 after Penthouse, in a change of strategy, had repeatedly denied the existence of such projections and budgets, leading Judge Griesa to recess trial to permit further discovery by Playboy. Eight such projections were finally produced by Penthouse, more than four years after Katsoff's deposition and after repeated unsuccessful efforts by Playboy to obtain them pursuant to the Federal Rules of Civil Procedure, which were thwarted by non-production and false statements that they never existed. Two of them appear to have been authored by Katsoff and two others have his name on them as a distributee. (App. 2645, 2647, 2648, 2651) At the later sanctions hearing he conceded that they were "the Advertising Department's anticipation of annual advertising revenues." (App. 1441).
 
 
 10
 On June 24, 1974, Robert Guccione, Publisher of Penthouse, testified at his deposition (attended by Grutman) that he had received forecasts of advertising revenues to the end of Penthouse's fiscal year, which closed in January, and that he had recently received a forecast, which he described as "a piece of paper which is constantly updated each week" showing "(n)ew prospects, actual placements, actual contracts, (and) drop-outs" (App. 466).
 
 
 11
 Armed with the foregoing information, Playboy on March 4, 1975, served upon Penthouse a request pursuant to Rule 34, F.R.Civ.P. for documents, which sought inter alia :
 
 
 12
 22. Financial statements of plaintiff for all periods beginning after December 31, 1969, including but not limited to balance sheets, profit and loss statements and schedules of revenues from the sale of advertising space in Penthouse Magazine.
 
 
 13
 23. Projections or estimates made by or on behalf of plaintiff of anticipated advertising space sales in Penthouse Magazine for all issues beginning with the January, 1972 issue and including issues yet to be printed or distributed. (App. 232).
 
 
 14
 By letter dated April 1, 1975, from Alan M. Gelb, Grutman's partner, addressed to David Krupp, Playboy's counsel, Penthouse objected to production of the requested financial statements as "privileged," "confidential," and "not relevant." However, Gelb's letter did not object to production of Penthouse's advertising revenue projections, the existence of which had been testified to by Katsoff and was to be confirmed by their production years later after intervening denials under oath. Undoubtedly these important and at that time recently made documents, which were not moved to a warehouse until February 1977 (App. 1698), were then still in Penthouse's offices and available to its counsel.
 
 
 15
 Penthouse's tendency to obstruct discovery soon became more apparent when, later in 1975 and early 1976, despite an order by then U.S. Magistrate (now Judge) Gerard Goettel, it failed to respond to interrogatories and was fined $250 by Judge Wyatt. In 1977, after it gave incomplete and evasive answers to interrogatories regarding advertising revenues allegedly lost and failed to appear at a hearing with respect to the matter, U.S. Magistrate Bernikow recommended imposition of $150 costs and expenses on Penthouse, which were imposed by Judge Griesa.
 
 
 16
 The next relevant episode was Playboy's taking on June 22, 1977, of the deposition (attended by Grutman) of Gerald Kreditor, an English accountant with a London office who was the "second in command" at Penthouse under Guccione. He testified that projections of Penthouse's advertising revenues had been prepared by the advertising staff, which we now know to have been the fact (App. 479-80). In addition he disclosed that comprehensive budgets had been prepared for "the last four years or so," which were circulated by "the controller to Mr. Billman, myself, and Mr. Guccione," and of which he was "sure that (he) would have copies" with "(t)he likelihood (that) there would have been copies ... in the United States as well, because they would have emanated from the United States." (App. 478-81). The record reveals that during the deposition Grutman paid close attention to this discussion of projections and budget estimates, interrupting it several times.[3] (Id.) What Kreditor said was later confirmed by the testimony in 1978 of Robert Aronson, Assistant Controller of Penthouse from June 1973 to April 1974 and Controller thereafter until September, 1975. (App. 1519-20). These budgets, which were eventually produced under pressure after trial was recessed for further discovery, could have been helpful to Playboy; one, which was undated, but appears to have been prepared shortly before the Kabler letter, projected advertising revenues for 1974 at $9,183,762 (App. 2657) which a comparison with other projections would show to be the equivalent of 605 advertising pages. A Penthouse advertising department projection reached almost an identical amount (App. 2654). This projection of 605 pages for 1974-75 represented an increase of only 15% over 1973-74, less than the 20% increase Penthouse claimed it had anticipated.
 
 
 17
 On July 8, 1977, two weeks later, Playboy served on Penthouse another request for documents pursuant to Rule 34, F.R.Civ.P., which repeated and amplified its March 4, 1975, request and asked for the following, which included budgets:
 
 
 18
 2. All projections or estimates made by or on behalf of plaintiff with respect to advertising sales for the United States edition of Penthouse magazine in pages or dollars, for any period since 1969 to the date of the response to this request.
 
 
 19
 5. All schedules, charts, lists or financial statements reflecting the sales of advertising space in either pages or dollars in the United States edition of Penthouse magazine for any month or period commencing after December 31, 1969.
 
 
 20
 17. Financial Statements of plaintiff for all periods beginning after December 31, 1969, including but not limited to balance sheets, profit and loss statements and schedules of revenues from the sale of advertising space in Penthouse magazine. (App. 419-22).
 
 
 21
 Penthouse objected on August 8, 1977, that the request sought "highly sensitive, confidential, commercial information and trade secrets" (App. 434, 435, 442). At pre-trial conferences before Judge Griesa in September, 1977, Grutman charged that Playboy was prolonging and abusing the discovery process, leading Judge Griesa to impose a moratorium on further discovery. This move, as it turned out, avoided disclosure of highly relevant and important projections and budgets which had been prepared at the request of Penthouse officials and were known to them as early as 1974, when the depositions of Katsoff and Guccione were taken, and which had been referred to by Kreditor in his 1977 deposition.
 
 
 22
 Playboy's counsel continued after Penthouse's August 8, 1977, response to seek the requested documents, but on August 16, 1977, U.S. Magistrate Jacobs stayed the request, including that for "documents relating to advertising sales and expenses" (App. 446), until Judge Griesa's return from vacation. Finally, at a pre-trial conference held by Judge Griesa on November 17, 1977, Grutman represented to the court that the requested budgets and advertising projections did not exist.[4] This, of course, temporarily stymied any further efforts to obtain these important documents.
 
 
 23
 Proceeding on the basis that no budgets or advertising projections existed, Penthouse pushed its case to trial, which began on January 31, 1978. Katherine Keeton, Associate Publisher of Penthouse, who was later described by Guccione as the higher echelon Penthouse official with responsibility for advertising (App. 811), testified that prior to the Kabler letter Penthouse advertising revenue projections had been made at the beginning of each year (App. 774-75), that she was not aware of any written projections (App. 778), and that based on her recollection Penthouse had anticipated at least a 20% increase in advertising revenues in 1974 over 1973 (App. 775). When Playboy counsel objected to her testifying as to the contents of projections without producing them, Judge Griesa inquired of Grutman, "Was an effort made to find any written projections?," to which Grutman replied, "Yes, your Honor-We do not have any written projections. We have the testimony of this witness and the performance of the company" (App. 777). This was a false statement. Written projections, some rather unfavorable to Penthouse's cause, did exist and were in its possession. Furthermore the trend of the projections for the year 1974-75 was generally downward, up to the time when the Kabler letter was sent (App. 2647, 2648-49, 2651-52, 2654). This trend would permit a trier of fact to infer that Penthouse's advertising sales were falling short of its expectations long before the Kabler letter was sent, and that the decreases that did occur after the letter were attributable to causes other than the letter. Nevertheless, Grutman's strategy was to introduce oral testimony of Keeton and Kreditor as to the advertising revenues Penthouse had anticipated prior to the Kabler letter, which were more favorable to it than most of the unproduced written projections, and then compare them with the revenues actually realized by Penthouse.
 
 
 24
 The same strategy was pursued by Grutman in his examination of his next witness, Robert Guccione, Publisher of Penthouse. Immediately prior to Guccione's taking the stand Playboy's counsel pointed out that in August, 1977, Penthouse had objected to the request for production of advertising projections on the ground that they were "highly sensitive" and "confidential." Grutman responded, "There are no written projections.... I represent that it was not part of the business of Penthouse and it did not keep or maintain forecasts or written projections" (App. 804, 808). When Judge Griesa pointed out that "if no such forecasts existed your answer would have been, 'No such forecasts exist.' It wouldn't be that Request No. 2 calls for disclosure of highly sensitive, confidential information and trade secrets," Grutman responded:
 
 
 25
 No forecasts do exist. As Mr. Guccione is to be the next witness, I think I can say in advance of his testimony that the only thing kept at Penthouse in written form is a schedule called "Penthouse Advertising Sales Report" in each calendar year, which is updated on an ongoing basis reflecting the revenues achieved. There are no projections, there are not (sic) estimates in writing.
 
 
 26
 THE COURT: You are using the present tense. Do you mean that projections once existed but have been destroyed?
 
 
 27
 MR. GRUTMAN: No, your Honor. They never prepared written projections or written estimates. (App. 809-10).
 
 
 28
 This statement was doubly false. Penthouse had prepared written forecasts and they were in existence.
 
 
 29
 Thus alerted by his counsel, Guccione, instead of merely denying the present existence of any advertising revenue forecasts, projections, or estimates, went further and testified that he had never seen any such documents other than a "pagination sheet" (App. 811-13, 831-32, 842-43), which he described as "a simple piece of paper that may float around the editorial department prior to the pagination of any given issue of the magazine to show that who (sic) are paginating the magazine, are selecting the editorial, the space requirements for design and layout purposes, and just what ads to expect for that particular issue" (App. 813). Guccione further testified that none of the "pieces of paper" or "pagination sheets," which he described as "scrap paper," were kept (App. 844).
 
 
 30
 When Playboy's counsel then asked for production of whatever documents did exist Grutman replied, "The witness has said for the last 40 minutes no such documents exist." (App. 845). Judge Griesa commented, "I am assuming definitively there are no such papers and I don't think anything more needs to be said. That is the testimony" (App. 847). Mr. Grutman then recalled Ms. Keeton to the stand and when he sought by indirection, with the aid of a Penthouse document which it had refused to produce in response to Playboy's July 8, 1977 document request on grounds of confidentiality, to have her testify to the substance of the document, Judge Griesa sustained Playboy's objection (App. 895-900).
 
 
 31
 In line with Grutman's representations to the court, Kreditor, who had testified at his June, 1977, deposition that projections of advertising revenues had been made by Penthouse, now testified at trial in 1978 that there had never been any written projections or forecasts of Penthouse advertising sales (App. 911-12, 967). When he then attempted to testify about Penthouse's advertising sales in 1970-73 and to 1974 sales to certain customers allegedly lost as a result of the Kabler letter, Playboy objected on the ground that its request for documentary evidence of these sales had been refused. The objection was sustained to the extent that Penthouse should supply the underlying figures (App. 913-39). Kreditor, using schedules prepared from Penthouse's records, testified that in 1973 he, with Guccione and Keeton, had estimated that 1974 advertising page sales would increase by more than 30% over the figures for 1973 (App. 943). Kreditor further testified that, comparing these projected increases against advertising sold to recipients of the Kabler letter, the revenue lost to Penthouse was $6,670,550 (App. 969).
 
 
 32
 Kreditor's trial testimony that there had never been any written projections or forecasts of Penthouse's advertising sales was later disproved by proof that such projections had been prepared and distributed to various top Penthouse officials, as Kreditor had indicated in his June, 1977, deposition. Kreditor clearly knew of these documents. A memo enclosing a Penthouse advertising projection dated December 7, 1973, for the period February 1974 to January 1975 lists Kreditor as a distributee (App. 2135), as does a Fall 1974 forecast for Penthouse's New York advertising staff (App. 2140). Katsoff, moreover, testified that Kreditor would have known about advertising projections (App. 1442).
 
 
 33
 Similarly Kreditor's trial testimony that no written Penthouse budgets had been prepared which would show estimated advertising revenues and expenditures was disproved. That such budgets had been prepared and circulated by Schneider (Penthouse's controller in 1973) and Aronson (his successor) to Billman (Penthouse's chief operating officer) and to Kreditor, had been admitted by Kreditor in his June, 1977, deposition and was confirmed by Aronson's later testimony (App. 1591). Nevertheless, when Kreditor was interrogated at trial regarding budgets, the following colloquy ensued (App. 991-992):
 
 
 34
 MR. GRUTMAN: I haven't them (budgets), your Honor. I have said it before. The witness has sworn to it. They don't exist.
 
 
 35
 I don't have them. How can I produce what doesn't exist?
 
 
 36
 THE COURT: There is a very serious question of credibility.
 
 
 37
 MR. GRUTMAN: Well, now, your Honor, you say that-
 
 
 38
 THE COURT: There is. I heard the testimony on the deposition of Mr. Guccione. I have just heard the testimony on the deposition of Mr. Kreditor, and both of those depositions, particularly the deposition of Mr. Kreditor, would say to me that there are written budgets or there were written budgets. If the testimony at the trial is contrary to the deposition, it raises a standard garden-variety issue of credibility, and I have to determine that.
 
 
 39
 MR. GRUTMAN: May I ask, most respectfully, your Honor, since you raise this question, I have made a representation and the witness has testified. I invite the Court to ask Mr. Kreditor if such written budgets exist. And you can have a flat answer, because we are not withholding anything and we have not destroyed anything....
 
 
 40
 But if it doesn't exist, if it isn't saved or it is scrapped or discarded, how can you tell that you have a credibility issue which suggests that we have failed to produce what exists?
 
 
 41
 THE COURT: We have a credibility problem about whether the things ever existed, whether they still exist, whether they have been destroyed, whether they have been kept.
 
 
 42
 In a long, obfuscatory statement Kreditor then testified that the term "budget" had referred to a compilation of financial data and estimates received by him from the United States and collated by him in England,-"masses of pieces of paper,"-which had been put in "literally many, many thousands of files," and that he had these "sort of budgets" only for "the last two or three years" (App. 995-98). Grutman then interpolated:
 
 
 43
 May I make just one observation on the record because this has been spread at such length.
 
 
 44
 I can assure your Honor that if documents existed for the kinds of materials, we would turn them over.
 
 
 45
 We are not (with)holding anything. Mr. Krupp may have his suspicions. If such budgets existed I think we would be happy to turn them over because they would support our claim. (App. 1003).
 
 
 46
 On the following morning Mr. Kreditor testified:
 
 
 47
 Q Mr. Kreditor, did any budgets exist for self-promotional advertising expense in 1973?
 
 
 48
 A The answer to that is no. There were no budgets-we are back to this question again-there were no individual budgets of an individual expenditure. (App. 1088).
 
 
 49
 Later in the day Mr. Grutman reported to the court:
 
 
 50
 I am told that I can stand upon the representation I made on behalf of my client. There were no forecasts, no budgets, no prophecy. None of the material about which Mr. Krupp was asking loudest. (App. 1101-02).
 
 
 51
 As we now know, all of this was untrue. At the request of Billman, Kreditor and himself, Stephen Schneider, Penthouse Controller from February, 1973 to April 1974, had in 1973 prepared a written budget for 1973 (App. 1848-49) and Robert Aronson, his successor, had prepared a budget for 1974 (App. 1514-15). Both showed projected advertising expenses and revenues. In his deposition testimony Kreditor stated that both had undoubtedly gone to Penthouse's top officials, including himself (App. 481). Later Kreditor was to take the indefensible position at trial that these had merely been "individual tries at budgets at different times" (App. 1136) and in an August, 1978, affidavit, that the budgets prepared by Schneider and Aronson, which broke down Penthouse's advertising costs, an important part of its claim, were not "budgets" in the true sense because Kreditor had never approved them (App. 1979-86).
 
 
 52
 In addition to the false testimony of Kreditor, Keeton, and Guccione and the misrepresentations of Grutman regarding projections and budgets, the testimony of Billman, Penthouse's Chief Operating Officer, at his June 20, 1974, deposition that he did not prepare Penthouse cash flow charts or know of anyone who prepared such charts for him (App. 471) was refuted by the later testimony of Aronson and the August 15, 1978, affidavit of Schneider. Mr. Aronson testified that he produced cash flow projections several times a year and sent them to Mr. Billman as well as Mr. Kreditor (App. 1538-39). Mr. Schneider stated in his affidavit that he produced cash flow projections several times during his employment with the company and gave them to Billman. (App. 1849-50). At trial, when Billman was asked if he made cash projections he stated that he did not. When asked if he supervised anyone who did he said that Richard Smith, the Circulation Director, did, but did not indicate that Aronson and Schneider had done so as well. (Trial Trans. 763).[5] As key witnesses called by Grutman testified at trial to important facts which would normally be found in corporate records and confirmed under oath Grutman's representations that such records had not been made or did not exist, Judge Griesa became increasingly apprehensive about the "credibility of the witnesses," noting "that there is a substantial difference between the testimony of Mr. Kreditor in this court and the testimony of Mr. Kreditor in his deposition" (App. 1016-17). He further observed:
 
 
 53
 Over the weekend I read very carefully the testimony of Mr. Kreditor and then the deposition testimony of Mr. Kreditor, et cetera, et cetera, all the materials that got into the record on this subject Friday.
 
 
 54
 From Mr. Kreditor's deposition, I would have inferred that there were budgets embodying projections, including projections of advertising revenues, and that those budgets were created in written form, beginning some four years ago. That is the testimony.
 
 
 55
 Now, both Mr. Kreditor and other witnesses at the trial and Mr. Grutman have represented to this Court in the trial that aside from the specific documents, like Plaintiff's Exhibit 77-type documents, the ones that we have here, no other projections now exist.
 
 
 56
 Obviously, if that representation or those representations are incorrect for any reason, then that should be corrected and the documents should be produced, if they exist. That goes without saying.
 
 
 57
 However, we have, as I said, the testimony and the representations that no such documents exist.
 
 
 58
 Under those circumstances-obviously, I don't have the power to order the production of something that don't (sic) exist. I may draw inferences about them, I may do other things, but you are talking right now about getting documents. (App. 1104-5)
 
 
 59
 By February 13, 1978, it had become clear that Penthouse had, through its claims of privilege, withheld many crucial documents that were discoverable under Rule 34. At this point Playboy's counsel renewed Playboy's request for many of the documents Penthouse had refused to produce when it claimed privilege in August, 1977, including requests for budgets and advertising projections (App. 1101-10). Judge Griesa recognized the relevancy and importance of the requested documents, stating:
 
 
 60
 I think prima facie the list read by Mr. Krupp does relate to relevant documents. I am not going to try to decide the exact boundaries this afternoon, but I will say that in the ensuing days or what we have, in whatever detail I have to get into it....
 
 
 61
 As far as the financial statements are concerned, that may be an area where, in terms of relevance, it is somewhat down the line, and obviously they aren't just stacks and stacks of financial statements. If we come to the point where we end up disagreeing on the handling of the financial statements, I can rule on that. (App. 1112-13).
 
 
 62
 He thereupon directed Grutman to make further efforts to find the documents and adjourned the trial to permit Playboy to have further discovery.
 
 
 63
 At a court hearing on March 3, 1978, Grutman expressly disclaimed any withdrawal of Penthouse's claims for lost advertising revenues and expenditures of funds for defensive advertising (App. 1173). He further conceded that, although Playboy was entitled to examine some Penthouse documents relating to these matters, which he had sought to dissuade it from examining on the ground that they were too voluminous, Playboy's counsel was not entitled to examine all of Penthouse's financial records (App. 1173-74). Then Mr. Grutman, "with some blushing," made the startling revelation that the budgets which he had steadily represented both before and at the trial not to exist, actually did exist (App. 1174-75). He sought to excuse his conduct on grounds that the records were not "company" but "department" budgets and projections which had been prepared not by "top executives of the company, but by merely departmental underlings" (App. 1175). In fact the budgets, which were turned over to Playboy's counsel, were overall company budgets projecting income and expenses for all departments (App. 2657-2683), including advertising expense and revenues, and were used for comparison with later monthly income statements (App. 1514-16, 1592, 1848).
 
 
 64
 Playboy continued to press Penthouse for disclosure of its financial statements, including gross income, net income and circulation revenues, which had been demanded by its July 8, 1977, Rule 34 notice. There followed another hearing by the court on March 22, 1978, at which Grutman again claimed that some of the financial records were irrelevant and confidential. With respect to Penthouse's general financial statements, Playboy's counsel pointed out their relevancy:
 
 
 65
 I think that total income is relevant to the inquiry. When we talk about a self-promotional advertising budget, for example, you look at it in the context of what the company's total income is for a given year. (App. 1331).
 
 
 66
 Penthouse counsel argued in response that "(t)here is no necessary correlation between the total revenues or the net revenues of any magazine and the net amount of money which that magazine spends in promoting itself in the trade to attract either advertising or (r)eadership" (App. 1332).
 
 
 67
 Playboy counsel contended in reply that the figures were relevant because "businessmen will say and indeed their records demonstrate that one way of approaching the amount of dollars that one budgets for advertising is to take it as a percentage of anticipated gross revenues," (App. 1334)[6] to which Judge Griesa replied:
 
 
 68
 The one thing I do know is we have lots of damage claims here and we are talking about certain types of revenues. When we were at trial the relevant area of proof seemed to me to expand just beyond the question, the absolutely limited question of advertising revenues and so forth. I am just not prepared to cut off at this point, in view of the history of this case where we were badly penalized, it seems to me, by having inadequate discovery before the trial and I don't want a repetition. (App. 1336).
 
 
 69
 By this time Judge Griesa, having heard a good deal of the trial testimony introduced by Penthouse and being intimately familiar with the damage issues, concluded that the Penthouse financial records requested by Playboy were relevant to determine the amounts which Penthouse would normally be expected to budget for and expend on advertising, which could then be compared with the amounts actually expended by it, and that Playboy, proceeding under discovery rules that were more liberal in scope than the rules of evidence which would govern admissibility at trial, was entitled to examine them. He then ordered as follows:
 
 
 70
 THE COURT: I am not talking about the merits of the case. I am talking about the discovery proceedings which bring us here. I will rule that the documents in question, if they contain the information about total revenues, circulation revenues, net income, all such documents are to be produced. (App. 1339).
 
 
 71
 Grutman then indicated that his client might refuse on grounds of confidentiality to obey the court's order, which directed production of all relevant Penthouse financial statements in full (App. 1339-40). There was a partial submission of some of the records which, contrary to Judge Griesa's directions, had been edited. However, Penthouse refused to produce the balance, despite their relevance and the non-sensitive character of some of the information, which was then four or five years old.
 
 
 72
 Playboy moved pursuant to Rule 37(b), F.R.Civ.P. for sanctions, seeking dismissal of the action, based on Penthouse's defiance of the March 22 order. On July 31, 1978, and August 28-29, 1978, the court held evidentiary hearings on the motion. At the outset of these hearings, on July 31, Judge Griesa reviewed with counsel the precise documents which Penthouse had refused to disclose to Playboy despite the court's March 22 order and their relevancy, establishing that while there was ambiguity as to some documents, Penthouse had refused to produce certain records containing information about its total revenues, circulation revenues, and net income.[7] When Grutman sought to reargue the relevance and confidentiality of these records, Judge Griesa, after listening to some argument, refused to permit further reargument or to examine a brief, pointing out that the matter had been fully covered before he ruled on March 22 and that thereafter Grutman had failed during the months of April, May, and June to submit a brief.[8]
 
 
 73
 The court received the affidavit of Stephen Schneider, Penthouse's former Controller and a member of the New York bar, regarding the preparation and distribution in 1973-74 of overall Penthouse budgets and cash flow projections, the testimony of Robert Aronson, Schneider's successor, with respect to the preparation and distribution thereafter of Penthouse's cash flow projections and formal budgets; and the testimony of Sherwood Katsoff, then administrator of advertising for Penthouse, who was called by it, that he and other advertising executives had prepared written advertising projections in 1973 and 1974 which were known to Kreditor, Billman and Keeton (App. 1442). In addition Penthouse introduced the testimony of Mr. John J. Holland, Penthouse's current controller, who was unfamiliar with relevant documents prepared prior to his assumption of his duties in November, 1975, but testified that in February, 1977, a large number of Penthouse records for the period 1973-75 were sent to a warehouse (App. 1698); Ms. Marianne Howatson, Director of Advertising, to the effect that at some time, which she could not specifically recall, Grutman had asked her for forecasts or projections of advertising sales and she had replied that Penthouse did not have any (App. 1776); and Mr. Grutman. In addition, the court received extensive documentary evidence. For example, one memorandum of Penthouse's Advertising Department dated January 3, 1974, which was before the Kabler letter, called a meeting of its New York sales staff "to discuss the depressed projections for May and June advertising in Penthouse." (App. 2656).
 
 
 74
 Grutman testified that, although he was in charge of the case, he had left to his partner, Alan M. Gelb, the handling of Playboy's March, 1975, request for Penthouse documents, including its financial records and projections (App. 1730-34). Grutman testified that although he "never saw a financial statement of Penthouse until we were actually on trial" (App. 1747), he had nevertheless taken the position from the outset that the requested documents were privileged as trade secrets and competitive commercial information from disclosure to Penthouse, a competitor (App. 1737-38). When the court pointed out to Grutman that Penthouse had not objected on any grounds to the 1975 request for production of the projections, Grutman could not explain his non-production of them during 1975-78 other than to testify that he believed it was up to Playboy to move for a court order, which it had not done. He also testified that he had objected to Playboy's July, 1977, request for production of documents, including financial records, budgets and projections, on the grounds that it was untimely (App. 1735) and the request was an attempt to involve Penthouse in a "morass of ongoing endless depositions, discovery and the like" (App. 1737). With respect to his representations made at the November, 1977, pretrial conference and later throughout the trial that there were no written budgets or projections, Grutman testified that he had been so told by Penthouse executives. He stated that Ms. Howatson, some time after he met her in 1976 or 1977, advised him that no such projections existed (App. 1726-30). He further testified that Mr. Holland, apparently some time in 1977, had told him that no budgets existed (App. 1725-26). Despite Kreditor's June, 1977, testimony that Penthouse budgets had been prepared, he testified that Kreditor had, at some time which Grutman could not specify, advised him that no budgets had been prepared but only "an attempt at a budget." (App. 1741-46, 1761). During Grutman's testimony Judge Griesa had extensive exchanges with him regarding these matters, stating:
 
 
 75
 ... I have a very serious question as to how an attorney can assert a claim of privilege without knowing the substance of the documents for which the privilege claim is asserted and I am told, sitting in court here today, that the assertion of claims of privilege in the objections of August, 1977 were made under circumstances where you do not believe that anyone in your firm, including yourself, ever saw the documents about which the privilege claim is asserted. (App. 1748).
 
 
 76
 Alan M. Gelb was not called to corroborate Grutman's testimony. At the conclusion of the sanctions hearings Judge Griesa kept open the possibility of sanctions short of dismissal, suggesting to counsel that there might be additional discovery followed by completion of trial without the documents withheld by Penthouse, and deferral in the meantime of his decision on sanctions (App. 1834). Proposed findings of fact and conclusions of law with respect to sanctions were submitted by Playboy (App. 2467-2501) including a portion of the trial transcript in the pending case of Gould Paper Corporation v. Curtis Circulation Company, 76 Civ. 1154 (S.D.N.Y.), showing that Grutman, who had represented to Judge Griesa in 1978 that prior to the trial of the present case he had never seen a Penthouse financial statement, was aware of and had in his possession as early as January, 1977, Penthouse financial statements for the period 1969-75 which he used in examination of Kreditor in the Gould Paper Corp. case (App. 2486-2490). These statements contain for each year much of the information sought by Playboy, including figures for circulation and subscription revenues from Penthouse magazine, advertising revenues, gross income, gross profit, advertising, general and administrative expenses, operating income and net income (App. 2508-61).
 
 
 77
 Penthouse counsel responded at length to the proposed findings, both by letters (App. 2502-2561) and by a long affidavit (App. 2563-2637). These papers, however, offered arguments in support of Penthouse's contentions that no basis existed for the court's March 22 order rather than facts or arguments seeking a lesser sanction than dismissal. At no time did Penthouse, although having the opportunity, seek mitigation of the sanction of dismissal sought by Playboy.
 
 
 78
 On March 31, 1980, Judge Griesa handed down a detailed decision analyzing the background facts leading up to Penthouse's defiance of his March 22, 1978, order and dismissing the complaint for non-compliance with that order. With respect to Penthouse's refusal to obey the order, the court stated:
 
 
 79
 Penthouse's positions on the motion (for sanctions) have been mainly (1) an attempt to obtain reconsideration of the court's directions of March and May 1978 to produce financial statement information regarding gross revenues, circulation revenues, and net income; and (2) an attempt to explain why Penthouse did not turn over advertising projections prior to March 1978.
 
 
 80
 On the first point, it should be noted that the matter was not only argued once on March 3, but was reargued on March 22. It was further discussed on May 12, 1978 in connection with Playboy's request for withdrawal of the limited confidentiality order. There was no question but that this court made a final ruling on March 22 regarding the basic question of production of the materials and made a final ruling on May 12 that the limited confidentiality restriction was withdrawn. Nevertheless, contrary to elementary principles of proper procedure, Penthouse not only refused to produce the materials, but persisted in attempting to further reargue the matter again and again in its papers submitted in opposition to the Playboy motion for sanctions. Although Penthouse did not submit a brief on the issue in March or May 1978, a brief was filed shortly before a hearing of July 31, 1978, in an attempt to obtain reargument at that time. I declined to accept the brief or hear reargument. 86 F.R.D. at 403.
 
 
 81
 The court found that it "strains credulity to believe that (Penthouse's) failure to produce the advertising projections in response to Playboy's March, 1975, request was the result of innocent mistake," id. at 404; that "Guccione, Kreditor and Keeton knowingly gave false testimony" regarding the existence of advertising projections, of which they were fully aware, id. at 405; that "there was a conscious decision by one or more persons in the management of Penthouse to conceal, and fail to produce, the advertising projection materials" in response to the 1975 request, id.; that it was "difficult to credit (Grutman's) testimony that he was totally divorced from this important phase of the litigation," id.; and that "(w)ith regard to Grutman, at the very least he was making representations to the court which he knew he had no basis to make. However, the strong probability is that Grutman knew at least in a general way of the existence of the advertising projections and nevertheless stated that there were no such projections. In either case there were willful misrepresentations to the court," id. at 406. In addition he found Grutman's testimony at the sanctions hearing that he "had never seen a financial statement of Penthouse" to be untrue, as was similar testimony by Kreditor, since the record in another case, Gould Paper Co. v. Curtis Circulation Co., 76 Civ. 1154 (S.D.N.Y.), showed that Grutman had in January, 1977, questioned Kreditor about audited Penthouse statements, some of which were for the relevant period and some of which were offered in evidence by Grutman in that case. Judge Griesa concluded:
 
 
 82
 Penthouse and its attorney flagrantly and willfully violated the rules of the discovery process over almost the entire course of this litigation. This was accompanied by subterfuge, misrepresentation and false testimony. Penthouse made a total mockery of the discovery process in this case.... 86 F.R.D. at 406.
 
 
 83
 Thus he dismissed the complaint. From this decision Penthouse appeals.
 
 
 84
 Playboy cross-appeals from a summary judgment awarded by Judge Inzer B. Wyatt in favor of Penthouse on September 26, 1974, dismissing the first four of Playboy's counterclaims (claiming violation of the Lanham Trade-Mark Act and unfair competition). Judge Wyatt, on the basis of affidavits from the parties, concluded that on the undisputed facts the comparative advertising complained of did not present the possibility of product confusion, an essential element, but on the contrary emphasized the differences between the two magazines rather than their similarities. He left standing the Fifth counterclaim, which charged false and misleading advertising. Playboy also contends that Judge Griesa erred in failing to assess costs, fees and expenses pursuant to Rule 37(b)(2), F.R.Civ.P., in dismissing Penthouse's complaint.
 
 DISCUSSION
 
 85
 At the outset, review of a few fundamental principles is essential. A federal district court possesses broad inherent power to protect the administration of justice by levying sanctions in response to abusive litigation practices. Roadway Express, Inc. v. Piper, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980); National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (per curiam). As the Court recently observed in Roadway Express, Inc., supra, 447 U.S. at 763-65, 100 S.Ct. at 2462-63:
 
 
 86
 Rule 37 sanctions must be applied diligently both "to penalize those whose conduct may be deemed to warrant such a sanction, (and) to deter those who might be tempted to such conduct in the absence of such a deterrent." National Hockey League v. Metropolitan Hockey Club, supra at 643, 96 S.Ct. at 2781.
 
 
 87
 In Link v. Wabash R. Co., 370 U.S. 626, 632, 82 S.Ct. 1386, 1389, 8 L.Ed.2d 734 (1962), this Court recognized the "well-acknowledged" inherent power of a court to levy sanctions in response to abusive litigation practices. The trial court had dismissed an action for failure to prosecute.
 
 
 88
 The authority of a federal trial court to dismiss a plaintiff's action with prejudice because of his failure to prosecute cannot seriously be doubted. The power to invoke this sanction is necessary in order to prevent undue delays in the disposition of pending cases and to avoid congestion in the calendars of the District Courts.
 
 
 89
 In National Hockey League v. Metropolitan Hockey Club, supra, 427 U.S. at 642-43, 96 S.Ct. at 2780-81, the Court expressed itself clearly:
 
 
 90
 The question, of course, is not whether this Court, or whether the Court of Appeals, would as an original matter have dismissed the action; it is whether the District Court abused its discretion in so doing....
 
 
 91
 There is a natural tendency on the part of reviewing courts, properly employing the benefit of hindsight, to be heavily influenced by the severity of outright dismissal as a sanction for failure to comply with a discovery order. It is quite reasonable to conclude that a party who has been subject to such an order will feel duly chastened, so that even though he succeeds in having the order reversed on appeal he will nonetheless comply with future discovery orders of the district court.
 
 
 92
 But, here, as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.
 
 
 93
 We have adhered to the foregoing views, holding in Cine Forty-Second St. Theatre v. Allied Artists, 602 F.2d 1062 (2d Cir. 1979), that grossly negligent failure to obey a discovery order may justify severe disciplinary measures:
 
 
 94
 The question before us is whether a grossly negligent failure to obey an order compelling discovery may justify the severest disciplinary measures available under Fed.R.Civ.P. 37....
 
 
 95
 These sanctions serve a threefold purpose.... (A)lthough the most drastic sanctions may not be imposed as 'mere penalties,' Hammon Packing Co. v. Arkansas, 212 U.S. 322, 29 S.Ct. 370, 53 L.Ed. 530 (1909); see Hovey v. Elliott, 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215 (1897), courts are free to consider the general deterrent effect their orders may have on the instant case and on other litigation, provided that the party on whom they are imposed is, in some sense, at fault. National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (per curiam); Societe Internationale pour Participations Industrielles et Commerciales v. Rogers, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958).
 
 
 96
 (P)lainly, if "fault" has any meaning not subsumed by "willfulness" and "bad faith," it must at least cover gross negligence of the type present in this case.
 
 
 97
 We believe that our view advances the basic purposes of Rule 37, while respecting the demands of due process. The principal objective of the general deterrent policy of National Hockey is strict adherence to the "responsibilities counsel owe to the Court and to their opponents," 427 U.S. at 640, 96 S.Ct. at 2780. Negligent, no less than intentional, wrongs are fit subjects for general deterrence, see G. Calabresi, The Cost of Accidents, 133-173 (1970). And gross professional incompetence no less than deliberate tactical intransigence may be responsible for the interminable delays and costs that plague modern complex lawsuits. 602 F.2d at 1066, 1067.
 
 
 98
 See in accord Chira v. Lockheed Aircraft Corp., 634 F.2d 664 (2d Cir. 1980).
 
 
 99
 Applying these principles, the record is clear that Penthouse deliberately disobeyed Judge Griesa's March 22, 1978, order to produce in full all of its financial statements for the relevant periods relating to gross income, net income and circulation revenue, including its balance sheets, and profit and loss statements, as had been requested by Playboy's Rule 34 demand dated July 8, 1977, and discussed in detail by counsel and the court at colloquys between them at pretrial, trial, and the later sessions in March, 1978. Equally clear was the relevance of the requested data, which bore directly on Penthouse's claim that it was forced to expend huge sums for corrective advertising because of the Kabler letters. The records were relevant to show that, having enjoyed increased revenues, it had for this reason spent larger amounts for self-advertising as a matter of business judgment rather than because of the Kabler letter.[9] The fact that the March 22 order was oral rather than written, and that it was not entered pursuant to a formal written Rule 37(a) motion, does not deprive it of any of its binding force and effect. Jones v. Uris Sales Corp., 373 F.2d 644, 647-48 (2d Cir. 1967); Henry v. Sneiders, 490 F.2d 315, 318 (9th Cir.), cert. denied, 419 U.S. 832, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974). The 1977 Rule 34 demand was made in writing, and was followed by an oral application by Playboy's counsel for an order directing that the requested records be produced. The court acted only after a thorough due process hearing at which the relevance of the requested records was discussed. In addition Judge Griesa had heard extensive testimony on the issues and reviewed the pretrial depositions. His order was recorded by the court reporter.
 
 
 100
 If Penthouse's failure to make discovery pursuant to the court's March 22 order stood alone against a background of compliance in all other respects, the harsh sanction of dismissal might not be justified, since the withheld data related to only a portion of the damages demanded by Penthouse, albeit a substantial one. (Penthouse claimed it spent $748,144 on self-promotional advertising and $625,000 for additional services of its executives and sales staff, all of which it sought to recover from Playboy.) But it would be excessively formalistic to view the defiance of the order in isolation rather than against the background of Penthouse's prolonged and vexatious obstruction of discovery with respect to closely related and highly relevant records, its budgets, advertising revenue projections and cash flow projections, which Penthouse kept from Playboy and from the court during the pretrial and trial of the case through perjurious testimony of its top officials and false representations to the court by its counsel.
 
 
 101
 (S)anctions must be weighed in light of the full record in the case, National Hockey, supra, 427 U.S. at 642, 96 S.Ct. 2778. Furthermore, '(i)f parties are allowed to flout their obligations, choosing to wait to make a response until a trial court has lost patience with them, the effect will be to embroil trial judges in day-to-day supervision of discovery, a result directly contrary to the overall scheme of the federal discovery rules,' Dellums (v. Powell), supra, 184 U.S.App.D.C. (339) at 343-44, 566 F.2d (216) at 225-36. (Cine Forty-Second St. Theatre v. Allied Artists, supra, 602 F.2d at 1068.)
 
 
 102
 There is ample evidence in the record supporting the district court's findings that various Penthouse executives were familiar with these important documents, that Kreditor knowingly gave false trial testimony to the effect that Penthouse had not prepared any written budgets, projections or forecasts of Penthouse's advertising sales and revenues for the relevant period, and that Keeton and Guccione deliberately gave false trial testimony to the effect that such written projections did not exist. The falsity of this testimony was established not merely by the records themselves but by the testimony of knowledgeable former Penthouse executives regarding their preparation and distribution.
 
 
 103
 On this record it is questionable whether Grutman intentionally and deliberately misrepresented to the court material facts with respect to the existence of the relevant Penthouse records. It is conceivable that he was misled by his client. However, the record does support Judge Griesa's finding that Grutman, beginning in November, 1977, was grossly negligent in not pursuing the matter more diligently to ascertain the facts from his client and his co-counsel who handled the case in earlier years under his supervision. Since Grutman had heard Katsoff testify at his 1974 deposition that advertising revenue projections had been prepared by Penthouse and both Katsoff and Guccione continued to be in Penthouse's employ in 1977 and 1978, the normal procedure would have been for Grutman to ask Katsoff and Guccione to locate them rather than to direct his inquiries solely to more recently employed Penthouse officers, such as Holland. Yet Grutman did not do this. Moreover, as Judge Griesa noted, if the documents did not exist, Penthouse's counsel would have stated, in its August 8, 1977, response to Playboy's requests for them, which had been made only 31/2 months earlier, that they did not exist rather than represent, as he did, that they were privileged from disclosure, which implied that they existed and had been examined by counsel. Even the position that they were confidential was at best tenuous since by 1977 projections and budgets made in 1973 and 1974 would have been ancient history.
 
 
 104
 In view of the relevance and importance of the withheld documents, Grutman, whose objective, according to Penthouse's brief (p. 7), was to "establish a reasonable anticipated growth in advertising sales which was frustrated and hampered by the libel," should have made a greater effort to locate the records at the times when he repeatedly represented to the court that they did not exist and, indeed, that they had never existed. In 1974 he had heard Katsoff and Guccione testify to their existence in their depositions and in June, 1977, he was made aware from the deposition testimony of Kreditor that advertising revenue projections had been prepared. On the latter occasion Grutman even mentioned the projections. Finally, Grutman's testimony that prior to the trial of this case he had never seen a Penthouse financial statement was disproved by the record in the Gould Paper Corp. case, which revealed that as early as January, 1977, he had in his possession Penthouse financial statements for the period from 1969 to 1975 containing the very information sought by Playboy. We are unpersuaded by his attempt to excuse this false statement on the ground that the financial statements in Gould Paper were prepared by an outside auditor rather than as entirely internal documents. The statements were prepared on the basis of information obtained from Penthouse by a firm hired and paid by it and were in its possession. Nothing in this record indicates that they were in any way different from those sought by Playboy.
 
 
 105
 Appellants argue that if they were intent on concealing the budgets, projections and cash flow forecasts, they would have gained nothing by having Grutman finally reveal them on March 3, 1978, after trial had been recessed for further discovery, and that they would have avoided any trouble simply by not producing them. This argument overlooks the fact that by that late date the scent had become too fresh and the trail too hot to risk further non-disclosure. Judge Griesa had been persuaded by Grutman's pleas at pretrial conferences that Playboy had become overly litigious in its discovery demands. However, once Judge Griesa during trial had read the pretrial depositions of Guccione and Kreditor, which revealed that advertising revenue projections had been prepared, Penthouse and its counsel faced the risk that Playboy would (as it later did) establish the existence of the documents through former Penthouse Controllers Stephen Schneider and Robert Aronson, now employed elsewhere, who would testify truthfully. With the court bent on a thorough investigation into the question of the documents' existence, Penthouse faced the risk that if Katsoff were called as a witness he might (as he later did in the sanctions hearings) testify that advertising projections had been prepared by Penthouse prior to the Kabler letter and that they were "the Advertising Department's anticipation of annual advertising revenues" (App. 1441).
 
 
 106
 Appellants contend that their long continued non-disclosure of the budgets and projections before they were forced at trial to produce them should be disregarded because Playboy never moved under Rule 37(a), F.R.Civ.P., for an order to produce those documents. We disagree. Although it is doubtful whether sanctions for non-production of documents could be imposed without Playboy's first obtaining a Rule 37(a) order for their production, except perhaps in the unusual situation where the exercise of inherent power to impose sanctions is appropriate, see Roadway Express, Inc. v. Piper, supra, this would not prevent the district court or ourselves from taking into consideration Penthouse's long history of obstruction of discovery of the budgets and projections and its false testimony and representations that they did not exist in considering the propriety of imposing the sanction of dismissal for violation of Judge Griesa's March 22, 1978, order, which was issued pursuant to Rule 37(a), for production of Penthouse's financial statements. Cine Forty-Second St. Theatre v. Allied Artists, supra, 602 F.2d at 1068.
 
 
 107
 When the projections were first requested by Playboy's Rule 34 demand in 1975, Penthouse did not object to their production. Not having objected, it was obligated to produce them without any court order. The functioning of the federal discovery rules depends upon each party's fulfilling this duty unless it asserts a non-frivolous objection or moves for a protective order under Rule 26(c). Otherwise the courts would be flooded by unnecessary, burdensome Rule 37(a) motions for orders to produce.
 
 
 108
 In such a system, designed to operate insofar as possible without judicial intervention, it is crucial, of course, that the initial request be answered and such objections as the party may have be set forth. If it were necessary to seek a court order requiring a response, followed by a response setting up objections, followed by a second motion to resolve the objections and order discovery, the possibility for delay and abuse would be apparent. Rule 37(d) makes it explicit that a party properly served has an absolute duty to respond, that is, to present himself for the taking of his deposition, or serve answers or objections to interrogatories served upon him, or serve a response to requests for discovery under Rule 34, as the case may be, and that the court in which the action is pending may enforce this duty by imposing sanctions for its violation. (4A Moore's Federal Practice Par. 37.05 at 37-100.)
 
 
 109
 Soon after Penthouse did object in the latter part of 1977 to production of the projections it represented to the court that they did not exist, which rendered useless the making of a Rule 37(a) motion thereafter by Playboy. Thus the perjury of Penthouse executives and the misrepresentations of its counsel became inextricably intertwined with its refusal to produce its financial records. Both attempts to obstruct were of the same piece, entitling the district court, in deciding what sanction to impose for violation of its March 22 order, to take into consideration the earlier history of obstruction with respect to the projections, even though Playboy's failure to obtain a Rule 37(a) order for their production might have precluded imposition of separate sanctions for their nonproduction, standing alone.
 
 
 110
 The prejudice to Playboy and to the court from Penthouse's unjustifiable obstruction of discovery in this case is readily apparent. By delaying the production of the requested Penthouse budgets and projections at trial after falsely representing them not to exist and by refusing to produce its financial statements Penthouse deprived Playboy of the opportunity to cross-examine key Penthouse witnesses fully with respect to the most important element in the case, the claims that Penthouse had as a result of the Kabler letter lost millions of dollars of advertising revenue and been forced to expend more than one million dollars on corrective advertising and sales expense in dealing with advertisers. More important, Penthouse's obstructive tactics led to enormous waste and delay in the trial and disposition of the case.
 
 
 111
 Nor are we persuaded by Penthouse's argument that the various financial data sought by Playboy were irrelevant because the charge was libel per se, not requiring proof of special damages, and were privileged from disclosure by reason of their trade secret status as private commercial information. If Penthouse had limited itself to a claim of general damages without proof of actual pecuniary harm its contention might be supportable, see Drug Research Corp. v. Curtis Pub. Co., 7 N.Y.2d 435, 440, 199 N.Y.S.2d 33, 37, 166 N.E.2d 319 (1960); Payrolls & Tabulating, Inc. v. Sperry Rand Corp., 22 A.D.2d 595, 257 N.Y.S.2d 884, 887 (1st Dept. 1965), but even then dubitante, since an action for trade libel in New York ordinarily requires proof of special damages unless the words impute deceit, Harwood Pharm. Co. v. National Broad. Co., 9 N.Y.2d 460, 463, 214 N.Y.S.2d 725, 727, 174 N.E.2d 602 (1961), and it is at least open to question whether Kabler's letter made such an implication. In any event where a plaintiff is not content to rest on a general damages claim but in addition seeks, as did Penthouse, special damages for loss of business, it may not use the per se rule to bar the defendant from then seeking to prove, as Playboy did here, that the alleged libel did not in fact cause such harm. Since Penthouse sought to introduce detailed oral proof of loss of business attributable to the libel, Playboy was entitled to rebut that evidence and to discovery of Penthouse's records for the purpose of doing so.
 
 
 112
 A party is not entitled to any absolute privilege from disclosure of its relevant business records. Drake v. Herrman, 261 N.Y. 414, 185 N.E. 685 (1933); Minerals & Chemicals Philipp Corp. v. Pan American Commodities, S.A., 15 A.D. 432, 224 N.Y.S.2d 763 (1st Dept. 1962); Penwalt Corp. v. Plough, Inc., 85 F.R.D. 257, 259 (D.Del.1979); Maritime Cinema Service Corp. v. Movies En Route, Inc., 60 F.R.D. 587, 590 (S.D.N.Y.1973). A plaintiff claiming special damages is expected to disclose its relevant records for the purpose of permitting the defendant to disprove the claim. If it desires protection it must seek a protective order under Rule 26(c), F.R.Civ.P. The district court has broad discretion to determine whether an order should be entered protecting a party from disclosure of information claimed to be privileged or confidential. Galella v. Onassis, 487 F.2d 986, 997 (2d Cir. 1973). Where, as here, the documents are relevant, the burden is upon the party seeking non-disclosure or a protective order to show good cause. Rule 26(c), F.R.Civ.P.; Citicorp v. Interbank Card Assn., 478 F.Supp. 756, 765 (S.D.N.Y.1979); Reliance Insurance Co. v. Barron's, 428 F.Supp. 200, 202-03 (S.D.N.Y.1977). In the present case, upon Penthouse's request Judge Griesa did enter a protective order limiting disclosure of some of the Penthouse financial records to Playboy's counsel, but later lifted the order, thus permitting disclosure to Playboy. Since many of the records were by 1978 long out-dated, the district court acted well within its discretion.
 
 
 113
 Turning to Playboy's first four counterclaims, we are satisfied that they were properly dismissed, substantially for the reasons stated by Judge Wyatt in his opinion dated September 26, 1974. An essential element of a claim for violation of the Lanham Act or for unfair competition under New York law- confusion-is absent. No reasonable person reading Penthouse's comparative advertisements could be deceived or misled into believing that Penthouse magazine was the same as a copy of Playboy. On the contrary, the Penthouse advertisements complained of emphasized the different (and allegedly better) quality of its magazine. See Societe Comptoir de L'Industrie Cotouniere Establishments Boussoe v. Alexander's Department Stores, Inc., 299 F.2d 33, 36 (2d Cir. 1962).
 
 Conclusion
 
 114
 Based on a thorough review of the record we are satisfied that Judge Griesa did not abuse his discretion in dismissing the action because of Penthouse's refusal to comply with his March 22, 1978, order. The financial records which Penthouse refused to furnish were relevant. Its defiance of the order climaxed a sordid pattern of prolonged and vexatious obstruction of legitimate discovery sought by Playboy, in which false testimony, material misrepresentations by Grutman and foot-dragging were used in an effort to prevent Playboy from getting at Penthouse records that were relevant to the central issue in the case, which was whether Penthouse had suffered any damages as a result of the Kabler letter. Judge Griesa exercised enormous patience and conscientiousness, giving Penthouse and Grutman a full opportunity to offer any relevant evidence and arguments, before imposing the sanction of dismissal in a reasoned opinion, as he clearly had the power to do, see Roadway Express, Inc. v. Piper, supra; National Hockey League v. Metropolitan Hockey Club, supra; Cine Forty-Second Street Theatre v. Allied Artists, supra. Where justified, as here, the imposition of sanctions for discovery abuse is essential to the sound administration of justice.[10]
 
 
 115
 Intervention by Norman Roy Grutman is granted. The judgments and orders of the district court are affirmed. Since Judge Griesa did not decide whether Penthouse or Grutman should be ordered to pay Playboy's reasonable expenses caused by Penthouse's failure to obey his order, as he was required to do by Rule 37(b), F.R.Civ.P., we remand the case for such a determination.
 
 
 
 [1]
 As the "ACCOUNTANTS' HANDBOOK," edited by Rufus Wixon, Ph.D. (Chairman of Accounting Dept., Wharton School of Finance) and Walter G. Kell, Ph.D., C.P.A. (Chairman of Accounting Dept., Syracuse Univ.) (4th ed. The Ronald Press Co. 1965) observes (§ 9-51):
 Advertising and Sales Promotion. This activity is ordinarily budgeted through an appropriation. The amount of the appropriation may be based solely on past experience such as a percentage of prior years' sales, net profits, or advertising costs, or it may be determined on the basis of current advertising objectives or a percentage of budgeted sales for the period.
 Blocker and Weltmer (Cost Accounting) point out that the percentage of budgeted sales method "results in the proper coordination of advertising and sales plans, and allows for expected changes in sales conditions; there is also a tendency for management to obtain a more accurate picture of the relationship between advertising cost, selling price, and profit per unit of articles sold so as to make revisions in advertising appropriations as unexpected conditions arise during the budget period." On the other hand, this procedure does not require a critical analysis of definite advertising objectives and the probable cost of obtaining them, and may result in misdirected advertising effort. (Emphasis added).
 It is also apparently not unusual for a company to agree to spend a certain percentage of its gross or net sales or revenues on advertising or promotion. Plum Tree, Inc. v. N. K. Winston Corp., 351 F.Supp. 80, 85-86 (S.D.N.Y.1972); Carter Wallace, Inc. v. Otte, 1978-1 Trade Cases (CCH), Par. 61, 976 (E.D.N.Y.1978).
 
 
 [2]
 References "(App.)" are to parties' Joint Appendix
 
 
 [3]
 For instance, see App. 481, where the following exchange occurred:
 Q Normally, to what group of executives in the company would such a document (budget estimate) circulate?
 MR. GRUTMAN: Budget income and outgo or just outgo? When you talk about outgo, cost of running an operation, or total revenue and total expenses?
 MR. KRUPP: He was talking about budgets, and I am only interested in the portion that relates to projection of advertising income.
 MR. GRUTMAN: Very well.
 It was normally never taken other than from the controller to Mr. Billman, myself, and Mr. Guccione. Mr. Guccione never got copies of them. What used to happen is I used to discuss it with Mr. Guccione.
 
 
 [4]
 Although the November 17, 1977, conference was not recorded, Judge Griesa later noted, at the later sanctions hearing, Grutman's earlier representation, to which Grutman's co-counsel and spouse replied "That is correct, your Honor." (App. 1651). Grutman has never denied that he made the representation
 
 
 [5]
 Apparently the Smith cash flow projections were just for circulation; the Schneider and Aronson ones were comprehensive
 
 
 [6]
 See Footnote 1, supra
 
 
 [7]
 THE COURT: I have got in front of me the March 22 minutes. They've got-let's look at Page 21. I ruled that the documents in question should be produced and I was specifically referring to either the originals or copies to be actually delivered to Mr. Krupp for his analysis at his office
 I ruled that the documents in question, if they contained information about total revenues, circulation revenues, net income, those documents were to be produced. (App. 1388).
 
 
 [8]
 THE COURT: I will repeat myself and that will end this phase
 If there was anything to be briefed after my ruling on March 22, and if, indeed, there had been any haste on anybody's part or any problem at all about the law being inadequately presented to the Court or inadequately considered by the Court, the obvious-obvious is an understatement, but I will use the word because I cannot think of any other word-the obvious think (sic) for the Penthouse attorneys to do was to move for reargument and address a brief to the Court, and that could have been done sometime during the four months or so between March 22 and now. That was not done, and to have a brief delivered on July 31 relating to questions which were addressed by the Court on March 22, is absolutely inexcusable.
 I will not receive the brief. It will go to the file as part of the record, but I will not consider the brief, and I will not consider the arguments therein, because would would start a new round of briefing. (App. 1416-17).
 
 
 [9]
 See Footnote 1, supra
 
 
 [10]
 See, e.g., Report of the Special Committee for the Study of Discovery Abuse, Section of Litigation, American Bar Association (October 1977); Brazil, Civil Discovery: Lawyers' Views of its Effectiveness, Principal Problems and Abuses, 1980 American Bar Foundation Research J. 789; Connolly, Holleman & Kuhlman, Judicial Controls and the Civil Litigation Process: Discovery (Federal Judicial Center 1978); Ellington, A Study of Sanctions for Discovery Abuse, Department of Justice (1979); Note, Sanctions Imposed by Courts on Attorneys Who Abuse the Judicial Process, 44 U.Chi.L.Rev. 619 (1977); Note, The Emerging Deterrence Orientation in the Imposition of Discovery Sanctions, 91 Harv.L.Rev. 1033 (1978); Report of the National Commission for the Review of Antitrust Laws and Procedures (1979); Dissenting statements of Justices Powell, Stewart and Rehnquist filed on May 1, 1980, upon the Supreme Court's transmission to Congress of certain Amendments to Federal Rules of Civil Procedure, 446 U.S. 997